[No. S004792. Crim. No. 26426. July 8, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOSEPH WADER, Defendant and Appellant.

618

**COUNSEL**

David R. Pettit, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Donald E. de Nicola, Carolyn D. Fuson, Sanjay T. Kumar and Susan Lee Frierson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Michael Joseph Wader of the first degree murder of Maxine Brown. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) The jury made a special circumstance finding of robbery-murder (§ 190.2, subd. (a)(17)(i)), and found to be true an allegation that defendant had used a firearm in committing the crime. (§ 12022.5.) The jury also found defendant guilty of kidnapping for purposes of robbery (§ 209, subd. (b)) and robbery (§ 211), and found firearm use allegations and great bodily injury allegations (§ 12022.7) as to both these crimes to be true.

The jury fixed the penalty for the murder of Brown at death. The trial court denied defendant's automatic motion to modify the verdict of death

(§ 190.4, subd. (e)), and imposed a two-year prison term for defendant's use of a firearm. On the kidnapping count, the court sentenced defendant to imprisonment for life with the possibility of parole, plus consecutive terms of two years for use of a firearm and three years for infliction of great bodily injury. For the robbery, the trial court sentenced defendant to imprisonment for three years, plus consecutive terms of two years for the firearm use and three years for infliction of great bodily injury. The court suspended the sentences on the noncapital counts. Defendant's appeal from the judgment is automatic. (§ 1239, subd. (b).)

We will affirm the judgment in its entirety.

## I. GUILT PHASE FACTS

### A. *Summary of Facts Relating to Guilt*

On the evening of November 15, 1984, defendant told his girlfriend, Mary Kimble, that he was going to commit a robbery. He went to a parking lot in Alhambra and, as the victim was getting into her car, ran up to her, pulled out his gun, and commandeered the car. Over the course of several hours, defendant drove around the Los Angeles area with the victim in the car, looking unsuccessfully for a restaurant to rob. Defendant then drove the victim's car to a church parking lot, ordered her to get out, and shot and killed her.

The next day, defendant and Kimble used the victim's credit card to purchase a pair of boots for defendant. When the police apprehended defendant on an unrelated charge, his voluntary statements to police and a pair of boots in his possession linked him to the victim's murder.

Defendant essentially admitted kidnapping, robbing and fatally shooting the victim, but denied any intent to kill. The jury made a special finding that defendant intended to kill when he fatally shot the victim.

### B. *Prosecution Evidence*

#### 1. *The Murder of Maxine Brown*

On November 15, 1984, the victim, Maxine Brown, drove to the Chatterbox Beauty Salon in Alhambra, County of Los Angeles, where she had a 5:30 p.m. appointment. The victim left the beauty shop about 6:45 p.m.; later that evening she was found dead in a church parking lot.

Defendant lived at 705 Los Robles in Alhambra with his girlfriend, Mary Kimble, and a roommate, Helena Ringey. About 5:30 p.m. on the day of the

killing, defendant borrowed Ringey's car. Kimble testified that before defendant left, he injected himself with cocaine, put his gun into his waistband,[1] and told Kimble that he was going to commit a robbery.

That same evening, at approximately 9 p.m., Mark Velarde, who lived across the street from the First Baptist Church in Bassett, stepped out his front door when he heard sounds "like firecrackers" coming from the direction of the church parking lot. Velarde heard three shots that were "fairly close" together; there was a slightly longer delay, however, between the second and third shots than between the first and second shots. Crouched near the rear of a car parked in the lot was a shadowy figure, who then entered into the car's driver's side. The car "screeched" out of the parking lot. Velarde identified the victim's car that was depicted in court exhibit photographs as resembling the car that he saw leaving the church parking lot.

Around 10 p.m., while on routine patrol, Deputy Donald Duffield of the Los Angeles County Sheriff's Department discovered the victim's body lying prone in the parking lot of the First Baptist Church. Deputy Duffield described the dead victim as "an elderly lady who was well dressed and [who] had a pool of blood on her chest."

Later that night, defendant returned to the Los Robles address. Ringey testified that when defendant returned driving a different car, he had a fresh red stain on his shirt. Defendant said that a robbery he had committed that night "didn't go" as planned.

Kimble testified that defendant told her that he "had to kill" a woman, and that he was alone at the time of the killing. Defendant later put a watch and a ring on the bed he shared with Kimble; Kimble pawned the ring and was wearing the watch when she was later arrested. The day after the shooting, defendant and Kimble used one of the murder victim's credit cards at Kinney's Shoe Store to buy a pair of boots for defendant.

2. *Defendant's Arrest and Inculpatory Statements*

On November 29, 1984, defendant was arrested on charges unrelated to this case and transported from the Alhambra police station to the San Bernardino County sheriff's station. Following his arrest, defendant made

---

[1]Although Ringey did not remember if defendant carried a gun before he left, she had seen defendant with a gun at other times. Ringey testified that court exhibit 10, a .357 magnum handgun, looked like the gun defendant had in his possession on November 15. Kimble testified that the gun was kept under the mattress of the bed she shared with defendant.

certain statements to sheriff's investigators relating to the November 15 killing of Brown.

a. *Defendant's Statements of November 29 and 30, 1984*

On November 29 and 30, 1984, defendant told Sergeant Rod Hoops of the San Bernardino County Sheriff's Department and Deputy Michael Griggs of the Los Angeles County Sheriff's Department that he was present when Maxine Brown was killed, but that he did not kill her.[2]

Defendant told the deputies that at 6 p.m. on November 15, 1984, the night of the killing, one Frank Hillhouse picked him up at his Los Robles residence in the victim's car. Defendant thought that the victim, who was seated in the front passenger seat, was someone who owed Hillhouse money and that Hillhouse was trying to collect on his loan. Hillhouse picked up a third individual, whom defendant did not know but whom he described as a "bushy-haired biker." Hillhouse then drove to the First Baptist Church parking lot, where the biker began striking the victim on the head with a knife. Hillhouse dragged the victim out of the car and shot her. Hillhouse, the biker, and defendant left in the victim's car. The next day Hillhouse used the victim's credit cards.

b. *Defendant's Statements of December 1, 1984*

On December 1, 1984, Deputy Griggs returned to the San Bernardino County sheriff's station, accompanied by another deputy, and again interviewed defendant. The deputies tape-recorded the interview.[3]

When Deputy Griggs confronted defendant with the inconsistencies between his prior statement and the evidence collected during the investigation, including the statements made by Ringey and Kimble, defendant said, "Well, I'm guilty. I did it to her." He then related the following:

He "went out to pull a robbery," and drove to a parking lot in Alhambra, where he saw the victim, Maxine Brown, leaving her car. Armed with a .357 magnum handgun, defendant ran up to her, ordered her back into the car, and drove away with her because he "couldn't leave her there to call the police."

Defendant drove to a North Hollywood pizza restaurant, which he intended to rob. He abandoned his plan when he saw a police officer sitting in the restaurant.

---

[2]Defendant made these statements under circumstances that we will more fully discuss in connection with defendant's argument that his statements were obtained in violation of the Fifth and Sixth Amendments of the United States Constitution.

[3]The tape recording of the interview was played for the jury at trial. The jury also received a typed transcript of the recording.

Defendant then tried to get money with Brown's automated bank teller card. At the first bank, defendant used a set of access numbers that Brown had given him for the automated teller machine, but the numbers did not work. Defendant and Brown then drove to another bank. This time defendant ordered Brown to get the money. While keeping Brown within easy shooting range, defendant watched her push the teller machine buttons. Brown returned and told defendant that she did not have enough money in her account. Defendant looked at Brown's checkbook, saw there was "$1,000 or $2,000" in her account and accused her of "playing games" with him.

Defendant drove off again with Brown, not knowing where he was going. He eventually stopped in the parking lot of the First Baptist Church in Bassett. Defendant again asked Brown for her bank card access numbers, but she replied that she had already given them to him. Defendant ordered her out of the car. She did so, then said she needed her house keys. Defendant took the keys out of the car ignition and handed them to the victim; she handed back to him two keys and a gold diamond ring.

Brown then got back into the car, saying she wanted her purse. Defendant replied that she could not have her purse because she would call the police. Brown said, "Well, I'm gonna call them anyway." Defendant responded by hitting her on the head with his gun. Brown started crying and defendant ordered her to get out of the car. As defendant told the deputies, "So she got out and she started walking and then she turned around and told me I'm gonna call the police and that's when I shot her. I jumped out and I shot her."

According to defendant, he fired the first shot in Brown's general direction "to scare her to try to get her to run." When the victim would not run, defendant, who was then outside the car, fired three or four more shots at her. Defendant told the deputies he "wasn't really aiming to hit her," but just wanted her to start running. Defendant did not think he killed Brown, because "she fell just like she'd fainted." Defendant then saw a man on a porch across the street, and "took off" in the victim's car.

Defendant later took two credit cards and a watch from the victim's purse, and threw the purse in a dumpster.

3. *Physical Evidence Relating to the Murder*

On November 18, 1984, Deputy Michael Griggs participated in the recovery of the victim's car from an Alhambra market parking lot. In the back seat of the car, Deputy Griggs found a yellow credit card receipt and a cash register receipt from Kinney's Shoe Store.

On the evening of November 30, 1984, Deputy Griggs seized a .357 magnum revolver from defendant's residence. Deputy Robert Hawkins, a firearms and toolmark examiner for the Los Angeles County Sheriff's Department, testified that he had examined the weapon and determined that the gun was a "single-action" revolver; to fire the weapon, the user must manually retract the hammer each time before pulling the trigger.

Deputy Hawkins also testified that on December 6, 1984, he retrieved two expended bullets and a piece of lead from the scene of the shooting at the church parking lot. He concluded that the expended bullets were fired from defendant's gun. After taking scrapings from ricochet marks on one of the church walls, he determined that the expended bullets, which also had wall plaster on them, had struck the church wall and did not cause the victim's death.

An autopsy was performed on the victim's body. Dr. Eva Heuser, a deputy medical examiner for the Los Angeles County Coroner's Office, reviewed the records and notes of the physician who had performed the autopsy. Dr. Heuser testified that the victim's cause of death was a gunshot wound to the chest, caused by a single bullet that entered the left side of her chest and exited through her back. The victim also had five or six lacerations on the back of her head that could have been caused by the butt end of a revolver.

## C. *Defense Evidence*

Testifying on his own behalf, defendant stated that he had heard the tape recording and read the transcript of the statement he made to Sheriff's deputies on December 1, 1984. After acknowledging that the transcript was "basically correct," defendant testified to a version of events that was essentially similar to his tape-recorded statements:

When defendant first saw the victim, he intended to steal her car and use it in a robbery. Defendant took the victim with him because he did not want her to report the car as stolen to the police. Although they drove to several places, defendant did not see a place suitable for robbing. He asked the victim to get money from her bank account, but that did not work out. Defendant got "pretty angry" because he felt the victim was lying to him about her bank card number. Also, he thought that the victim should have shown him more respect because he had a gun.

When they arrived at the church parking lot, defendant told the victim to get out of the car and leave; she refused. Defendant reached over to the passenger door, opened it, and "told her to get out or else I'd shoot." Once

again she refused. Defendant responded by hitting the victim in the head twice. When the victim stepped out of the car, she asked defendant for her purse. Defendant refused and said, "Leave. I don't want to shoot you but I will."

Defendant fired a shot through the open car door to scare the victim. The victim then asked defendant for her house key, and defendant gave it to her. Still she would not leave. Defendant jumped out of the car and told her, "Now, just leave. Just take off towards the park." At this point, defendant became increasingly angry. The victim said, "Well, I'm going to call the police." Again intending to scare the victim, defendant fired his gun two or three more times.

According to defendant, he did not intend to kill the victim. When she fell, he thought she had fainted. Defendant got back in the car and immediately left the parking lot without checking the victim's condition.

At trial, defendant demonstrated the manner in which he held his gun when he fired the shots at the victim. He held his arm parallel to the ground, pointing directly out in front of him. He testified he fired one shot with the gun pointing downward. When he was asked why he did not fire in the air or directly into the ground if his intent was to scare the victim, defendant responded that he did not know. Defendant said that he moved his hand each time he fired the gun.

Defendant used cocaine and "crystal meth" all night on the night of the murder. He injected the cocaine directly into his veins.

When defendant returned home, Ringey and Kimble asked him why he was so late. He told them, "I pulled a robbery. And it went bad, and somebody got shot." Although Ringey, Kimble, and defendant watched the news all night and bought three newspapers the next day to find out if there were any stories about the shooting, they learned nothing of the event.

## II. GUILT PHASE DISCUSSION

### A. *Validity of Defendant's Arrest*

Defendant contends his arrest was invalid, and thus its fruits, including his statements to police, should have been suppressed, because the arresting officers who entered the Los Robles house to serve the arrest warrant did not have reasonable cause to believe he was inside, thus violating section 844 and the Fourth Amendment of the United States Constitution. We disagree.

Section 844 requires police officers to have "reasonable grounds" to believe that a suspect is inside a dwelling before they may make a nonconsensual entry to effect an arrest.[4] This requirement applies to arrests with and without warrants (*People* v. *Jacobs* (1987) 43 Cal.3d 472, 478 [233 Cal.Rptr. 323, 729 P.2d 757]; *People* v. *Marshall* (1968) 69 Cal.2d 51, 55-56 [69 Cal.Rptr. 585, 442 P.2d 665]), and to peaceable as well as forcible entrances (*People* v. *Jacobs*, *supra*, 43 Cal.3d at p. 480).

At the hearing on defendant's motion to suppress evidence arising from his arrest, Officer Dennis Sullivan of the Alhambra Police Department testified that he first encountered defendant on September 30, 1984, two months before the arrest, when Sullivan investigated an apparent altercation between an unidentified man and Frank Hillhouse at the Los Robles street address where defendant was later arrested. In the course of determining whether he should arrest either party, Sullivan spoke to defendant inside the front room of the house. Defendant identified himself as Michael Wader, said that his girlfriend lived at the house, and that he had been in prison for murder for 20 years. Although Officer Sullivan made no arrests resulting from the altercation, he filled out field interview cards on defendant and Hillhouse.

On November 28, 1984, Officer Sullivan learned at roll call of two outstanding arrest warrants each for defendant and Hillhouse. He then drove past the Los Robles address, saw two cars in the driveway, and ran license plate checks. Neither car was registered to defendant. Officer Sullivan returned to the house in the early morning hours. He drove past the house slowly on several occasions, and at least once, used binoculars. Through a three-foot opening in the drapes of the inside front room, he observed defendant and a woman sitting on a couch backed up against the front window. The interior lights were on. Although their backs were to the window, Officer Sullivan could identify defendant because the man and woman turned toward each other, presenting profiles. Officer Sullivan was certain the man was defendant and not Hillhouse, because defendant was "thinner and lighter" than Hillhouse.

Officer Sullivan left the Los Robles site at one point; when he returned, one of the two cars was gone. At 2:30 or 3:00 a.m., the lights in the house went out. After staying at the location for two more hours, Officer Sullivan

---

[4]Section 844 provides: "To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired." (As amended without substantive change by Stats. 1989, ch. 1360, § 112, p. 5865.)

returned to the police station. At approximately 6:15 a.m., Officer Sullivan, assisted by another officer, returned to the Los Robles address with an arrest warrant. Employing a ruse, the officers obtained entrance to the house and arrested defendant.

At most, defendant contends, the police had a hunch that he was inside the house. In essence, defendant argues that Officer Sullivan's testimony was not worthy of belief because it varied in certain particulars from a written police report he prepared shortly after the arrest. First, defendant focuses on a statement in Officer Sullivan's report that when he drove by the house, he saw a man "later identified as" defendant. But Officer Sullivan testified that his reference to a subject "later identified as" defendant meant only that he later confirmed, by viewing defendant's driver's license, that the subject was indeed defendant.

Second, defendant stresses that Officer Sullivan wrote in the arrest report that he saw the backs of people in the Los Robles residence, but did not write that he saw their profiles, as he later testified. Any confusion or lack of complete consistency in a witness's testimony speaks to the weight of the evidence. (See 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1751, p. 1706.) This is a matter within the province of the trier of fact—here, the trial court.

Third, defendant contends that *People* v. *Jacobs, supra,* 43 Cal.3d 472, cannot be meaningfully distinguished from this case. We disagree. In *Jacobs,* the arresting officer testified he believed that the defendant was at a residence during daytime hours because the officer had obtained his address from an employment application, had seen the defendant at that address some three months earlier, and had learned the defendant was not employed during the day. (*Id.* at p. 478.) We held this evidence was insufficient to give rise to a reasonable belief that the defendant was inside the house. (*Id.* at p. 479.) Here, by contrast, the arresting officer personally observed defendant at the residence in the early morning hours before the arrest at dawn.

We conclude that substantial evidence supports the trial court's determination that Officer Sullivan had reasonable cause to believe defendant was inside the Los Robles address when he served the arrest warrant; accordingly, section 844 was not violated. (See *People* v. *Jacobs, supra,* 43 Cal.3d at pp. 479-480.) For the same reason, defendant has not demonstrated a violation of the Fourth Amendment. (See *Payton* v. *New York* (1980) 445 U.S. 573, 603 [63 L.Ed.2d 639, 661, 100 S.Ct. 1371].)

The officers searched the residence and found defendant. Defendant also argues that this nonconsensual search was unlawful because the arresting

officers did not have a search warrant, and there were no exigent circumstances justifying a warrantless search. But because the arrest was made under the authority of a valid arrest warrant and in conformity with section 844, the absence of exigent circumstances or a search warrant is of no significance.

### B. *Defendant's Statements to Sheriff's Deputies*

Defendant raises a number of guilt phase issues relating to statements he made to sheriff's deputies following his arrest. The relevant facts are as follows:

On November 29, 1984, defendant was arrested in Los Angeles County on a warrant issued in San Bernardino County for possession of narcotics on prison grounds. The arrest warrant was issued when defendant failed to attend a sentencing hearing in a then-pending matter.

About 4 p.m. on November 29, 1984, Sergeant Rod Hoops and two other deputies of the San Bernardino County Sheriff's Department transported defendant from the Alhambra Police Department to the San Bernardino Sheriff's Department in Ontario. During the ride, Sergeant Hoops asked if defendant knew the whereabouts of Frank Hillhouse, defendant's friend. Defendant replied he had heard that Hillhouse was in the Yucca Valley area of San Bernardino County and was involved in shooting a woman in the La Puente area. Sergeant Hoops testified he did not advise defendant of his constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602]) because defendant was at that time not a suspect in the murder of Maxine Brown.

The next day, November 30, Sergeant Hoops again questioned defendant without advising him under *Miranda*. This time, defendant said that Hillhouse had a .357 magnum gun, had used it to shoot "an old white broad," and had also taken the victim's car.

Sergeant Hoops then contacted Deputy Michael Griggs of the Los Angeles County Sheriff's Department, who informed him of some of the details of Maxine Brown's killing. Griggs mentioned that Brown's credit card had been used to buy a pair of boots from Kinney's Shoe Store. In a telephone conversation a few hours later, Griggs gave Hoops certain details regarding the boots. At that point, Hoops walked over to defendant and removed his boots to see if they matched Griggs's description of the boots that had been bought with the victim's credit card. After asking why Hoops was taking the boots, defendant volunteered that he had bought them and had a receipt.

Defendant then said, "Well, I changed my mind. They were a gift." Sergeant Hoops did not at any time ask defendant any questions about the boots.

Later that same day, November 30, Los Angeles County Sheriff's Deputy Griggs and Sergeant Stoner went to the Ontario sheriff's station to interview defendant. The deputies questioned defendant twice. Before the first interview, which was not tape-recorded, Stoner advised defendant of his *Miranda* rights by reading from a standard admonition card issued by the Los Angeles County Sheriff's Department. Defendant indicated he understood his rights, did not want an attorney at that time, and wished to speak to the officers without an attorney present.

The second interview on November 30 was tape-recorded. Before questioning defendant, Sergeant Stoner orally advised defendant of his constitutional rights by reading them from a form. Stoner misread one line on the form. The form stated: "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, free of charge." Instead, Stoner told defendant: "If you hire a lawyer one will be appointed to represent you before any questions free of charge." Before this oral advisement, Sergeant Stoner had given defendant a card that listed his constitutional rights; defendant signed the card immediately after the advisement.

The next day, December 1, 1984, the deputies questioned defendant in a tape-recorded session. There was another tape-recorded interview in February 1985. Each interview was preceded by an advisement, and waiver, of defendant's constitutional rights.

1. *Defendant's Statements to Sergeant Hoops on November 29, 1984*

Defendant argues that his uncounseled statements to Sergeant Hoops on November 29, 1984, were obtained in violation of his rights under the Fifth and Sixth Amendments to the federal Constitution and should have been suppressed. The Attorney General asserts that the issue was waived and, in any event, no constitutional violation occurred.

We agree that the issue was waived. At the beginning of the hearing on defendant's nonstatutory motion to exclude certain testimony, the prosecutor described the motion as "directed towards the statements . . . that were taken by [Sergeant] Hoops . . . ." Defense counsel agreed with this statement, and Sergeant Hoops was called as a witness and examined by both sides. But defense counsel never made clear on what grounds he sought to exclude defendant's responses to Sergeant Hoops's questions on November 29, 1984, as Evidence Code section 353 requires. (See *People* v. *Morris*

(1991) 53 Cal.3d 152, 188 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395].) The focus of argument at the conclusion of the court hearing shifted to the testimony of other witnesses, and the trial court did not rule on the admissibility of defendant's statements to Sergeant Hoops. Defense counsel never argued to the trial court that those statements should be suppressed. When Hoops testified at trial, defense counsel failed to object to his testimony on constitutional grounds. Accordingly, we conclude the issue was waived. (*People* v. *Boyer* (1989) 48 Cal.3d 247, 270, fn. 13 [256 Cal.Rptr. 96, 768 P.2d 610].)

■ Defendant alternatively contends that if the issue was waived, the failure to preserve it demonstrates his counsel's ineffective representation. The constitutional right to effective assistance of counsel is violated when an attorney fails to perform as a reasonably competent attorney, and it is reasonably probable that, absent counsel's deficiencies, a more favorable result would have been obtained. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687, 694 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 449 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Malone* (1988) 47 Cal.3d 1, 33 [252 Cal.Rptr. 525, 762 P.2d 1249].) Here, it is not reasonably probable that if defense counsel had pursued the Fifth and Sixth Amendment objections defendant now urges on appeal, there would have been a more favorable result.

Defendant's Sixth Amendment theory is that, because his arrest arose from a case pending in San Bernardino County in which he had requested and obtained a court-appointed attorney, Sergeant Hoops violated defendant's Sixth Amendment right to counsel by questioning him outside the presence of his counsel.

■ The purpose of the Sixth Amendment right to counsel is to " 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." (*McNeil* v. *Wisconsin* (1991) 501 U.S. __, __ [115 L.Ed.2d 158, 168, 111 S.Ct. 2204, 2209], original italics.) Thus, the Sixth Amendment right to counsel is offense-specific. (*Id.* at p. __ [115 L.Ed.2d at p. 166, 111 S.Ct. at p. 2207].) ■ Here, that right had not attached when defendant was questioned by Sergeant Hoops, because at that time adversary criminal judicial proceedings had not yet commenced in this case. Although defendant had obtained counsel in a case that was unrelated to this case, because defendant's Sixth Amendment right to counsel in this case had not attached it could not be violated.

██ Defendant also contends that his attorney was incompetent for not arguing that defendant's Fifth Amendment rights were violated by Sergeant Hoops's failure to advise him of his *Miranda* rights before asking him about the whereabouts of Frank Hillhouse. Generally, *Miranda* advisements must be given by law enforcement officers before any custodial interrogation. (*Miranda* v. *Arizona, supra*, 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602].)

Here, Sergeant Hoops's inquiry regarding Hillhouse was not "interrogation" within the meaning of *Miranda*. Not every question directed by an officer to a person in custody amounts to an "interrogation" requiring *Miranda* warnings. The standard is whether "under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'" (*United States* v. *Booth* (9th Cir. 1981) 669 F.2d 1231, 1237.) This is an objective standard. "The subjective intent of the [officer] is relevant but not conclusive. [Citation.] The relationship of the question asked to the crime suspected is highly relevant. [Citation.]" (*United States* v. *Gonzalez-Marez* (9th Cir. 1985) 752 F.2d 1485, 1489; accord, e.g., *United States* v. *Talbott* (4th Cir. 1990) 902 F.2d 1129, 1134.) As Sergeant Hoops's testimony indicates, his inquiry regarding the whereabouts of Hillhouse was designed to elicit information about Hillhouse, not defendant. There is no indication in the record before us that the inquiry was at all relevant to any charge for which defendant was then in custody or any crime of which he was then suspected. Accordingly, Sergeant Hoops was not required to advise defendant of his rights under *Miranda*, and defendant's counsel did not render ineffective assistance in failing to raise this issue.

2. *Allegedly Defective Miranda Warning*

As mentioned earlier, before questioning defendant on November 30, 1984, Sergeant Stoner advised defendant of his *Miranda* rights by reading them from a form. The full text of one of the rights stated: "If you *cannot afford to* hire a lawyer, one will be appointed to represent you before any questioning, free of charge." (Italics added.) Stoner, however, misread this; he omitted the three italicized words, instead telling defendant: "If you hire a lawyer one will be appointed to represent you before any questions free of charge." ██ Defendant contends this misreading invalidated the *Miranda* warnings, thus requiring suppression of the statements obtained as a result.

We reject defendant's contention for several reasons. First, 15 to 20 minutes before the tape-recorded interview in which Sergeant Stoner misread the advisement, defendant was advised of his rights under *Miranda* by

Sergeant Stoner in a manner he does not assert was inaccurate. Second, defendant indicated in writing immediately after the misadvisement that he understood his rights as set forth on an admonition card, and he signed the admonition card. With respect to the one right at issue here, the card correctly specified: "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, free of charge." Defendant does not argue misadvisement in this respect. Third, the United States Supreme Court has stressed that " 'the "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' " and that " 'no talismanic incantation [is] required to satisfy its strictures.' " (*Duckworth* v. *Eagan* (1989) 492 U.S. 195, 202-203 [106 L.Ed.2d 166, 176-177, 109 S.Ct. 2875], quoting *California* v. *Prysock* (1981) 453 U.S. 355, 359 [69 L.Ed.2d 696, 701, 101 S.Ct. 2806].) Under the circumstances, the proper warnings that immediately preceded Sergeant Stoner's misreading of one of the rights adequately advised defendant of his constitutional rights as required by *Miranda.*

### 3. *December 1, 1984, Interrogation*

■ We reject defendant's contention that his December 1, 1984, interrogation violated his right to counsel under the Sixth Amendment of the federal Constitution. That right, as we explained earlier, is offense-specific. In this case, that right had not attached when the police questioned defendant on December 1, because criminal proceedings against defendant in this case had not commenced; charges were not filed until December 5, 1984. The fact that defendant had obtained counsel in a case that was unrelated to this case did not implicate the Sixth Amendment, because the Sixth Amendment right to counsel is offense-specific. Accordingly, there was no violation of the right to counsel under the Sixth Amendment, and it was not ineffective for counsel not to argue there was such a violation.

### C. *Mistrial Motion Based on People v. Anderson*

■ Defendant argues the trial court erred in denying his motion for a mistrial based on this court's decision in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*).

This court held in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 140 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*) that the felony-murder special circumstance of section 190.2, subdivision (a)(17) required the prosecution to prove that the defendant intended to kill the victim, irrespective of whether the defendant was the actual killer or an aider or abettor. In *Anderson, supra,* 43 Cal.3d 1104, 1147, we overruled *Carlos* and held that a

felony-murder special circumstance may be found and the death penalty imposed without proof that the defendant intended to kill, unless the defendant was not the actual killer. We later clarified that the holding of *Anderson* did not apply to crimes committed while *Carlos* was in effect. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131]; accord, *People* v. *Fauber* (1992) 2 Cal.4th 792, 835 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

The crimes in this case occurred in November 1984, when this court's decision in *Carlos* was in effect. When the trial began, *Carlos* was still the law. This court filed its opinion in *Anderson* on October 13, 1987. On October 14, 1987, the prosecution in this case rested its case-in-chief. The next day, defendant moved for a mistrial.

Defendant's motion for a mistrial was based on the theory that his defense was structured around the central contention that, although he kidnapped, robbed and fatally shot the victim, he lacked the intent to kill her. On appeal, defendant contends that had he known that, under *Anderson*, the prosecution would not have to prove intent to kill, he would have structured his defense differently. But in arguing the motion at trial, the only material choice that defense counsel indicated might have been different was the use of peremptory challenges; defense counsel suggested that, had the defense known intent to kill would not be an issue, it would have tried to select a jury with only the penalty phase in mind.

The primary defect in defendant's argument is that, as this court has subsequently made clear, for crimes committed when *Carlos* was in effect the jury was required to find that the defendant had the intent to kill before a felony-murder special circumstance could be found true. (*People* v. *Duncan, supra,* 53 Cal.3d at p. 973, fn. 4; *People* v. *Fauber, supra,* 2 Cal.4th at p. 835.) In this case, the trial court's charge to the jury anticipated our later ruling that *Anderson* was not to be applied retroactively to crimes committed while *Carlos* was in effect. The trial court required the jury to find whether or not defendant "intended to kill a human being at the time of the murder." The jury expressly found that defendant had the intent to kill the victim.

Accordingly, defense counsel's strategy of basing the defense on defendant's asserted lack of intent to kill was in no way compromised by *Anderson,* because *Anderson* did not apply to defendant's trial. We therefore conclude that the trial court did not err in denying defendant's motion for a mistrial.

Our conclusion is not affected by the trial court's refusal to specifically instruct the jury that it must find intent to kill in order to find the robbery-murder special circumstance. As noted above, the trial court did require the

jury to determine whether or not defendant had the intent to kill. Thus, "the jury necessarily found the requisite intent to kill as a result of other properly given instructions . . . ." (*People* v. *Leach* (1985) 41 Cal.3d 92, 108 [221 Cal.Rptr. 826, 710 P.2d 893]; see also *People* v. *Mincey, supra,* 2 Cal.4th at p. 438.) We note that defense counsel in closing argument stressed to the jurors that they had to make a finding whether defendant had the intent to kill.

Nor does consideration of *Coleman* v. *McCormick* (9th Cir. 1989) 874 F.2d 1280 alter our conclusion. As we have elsewhere explained, "*Coleman* considered whether a trial held under one set of rules can later be used to reach a sentencing verdict under a quite different set of rules, and concluded it cannot." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 110 [279 Cal.Rptr. 276, 806 P.2d 1311].) Here, the rules governing the critical issue—whether the jury had to conclude that defendant had the intent to kill as a prerequisite to the felony-murder special circumstance finding—did not change during trial in any way that affected this case. Thus, *Coleman,* which this court is not bound to follow in any event, has no application here.

D. *Sufficiency of Evidence of Defendant's Intent to Kill*

 Defendant challenges the sufficiency of the evidence that he intended to kill Maxine Brown when he fired the fatal shot. We reject this argument.

 In assessing a sufficiency-of-evidence argument on appeal, we review the entire record in the light most favorable to the prevailing party to determine whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Price* (1991) 1 Cal.4th 324, 462 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We draw all reasonable inferences in support of the judgment. (*Ibid.*)

 Here, defendant's tape-recorded statement to sheriff's deputies on December 1, 1984, supplied ample evidence that he intended to kill Maxine Brown when he shot her. This is what defendant told the deputies: After driving with the victim in her car for several hours, looking unsuccessfully for a place to rob, he stopped at a church. Defendant eventually told Brown to get out of the car and start walking. Brown got out, but then came back into the car and asked for her purse. Defendant said, "No, you can't have your purse because you'll call the police." When Brown replied, "I'm going to call them anyway," defendant "got scared," and hit her on the head with

his gun, and told her to get out again. She did so. She then turned around and told defendant, "I'm going to call the police." At that point, defendant "jumped out and shot her."

Also, at trial defendant testified that when the victim was in her car in the church parking lot, he told her, "Leave. I don't want to shoot you but I will."

These statements by defendant strongly support the jury's conclusion that he intended to kill Maxine Brown when he shot her.

In the tape-recorded interview with defendant that was played at trial, defendant claimed he did not intend to kill the victim, but intended only to scare her. At trial, defendant made the same claim. He testified that as to the third (and fatal) shot, which hit the victim in the chest, he "just fired at random." The jury, however, was not required to accept that testimony. The jury was free to believe some of defendant's statements and to disbelieve other statements. (3 Witkin, Cal. Evidence, *supra*, §§ 1770-1771, pp. 1723-1725.) Moreover, the testimony of defendant's girlfriend, Mary Kimble, also supports the jury's finding that defendant intended to kill Maxine Brown when he shot her. Kimble testified that when defendant came home on the night of the crimes, he told her that things "went sour" and that he "had to kill" a woman.

Defendant emphasizes the evidence tending to show that the first two shots were fired at a downward angle, which, he argues, is consistent with an intent to frighten rather than an intent to kill. But defendant need not have intended to kill the victim when he fired the first and second shots. The jury's conclusion that defendant intended to kill when he fired the third and fatal shot, which hit the victim in the chest, is supported by evidence that the gun used by defendant required that he manually retract the hammer before pulling the trigger. The testimony of Mark Velarde also supports this conclusion. This witness, who lived across the street from the site of the killing, testified that he heard three shots. The first two shots were fired in rapid succession, but there was a slightly longer delay between the second and third shots than between the first and the second. In the context of this case, this delay is further evidence that defendant intended to kill the victim when he shot her in the chest.

E. *Jury Instructions on Intent to Kill*

 Defendant argues that the trial court committed reversible error in failing to instruct the jury that it must find intent to kill before it could find the robbery-murder special circumstance to be true.

As explained earlier, when the trial of this case began, *Carlos, supra,* 35 Cal.3d 131, which required proof of intent to kill as a prerequisite for a felony-murder special circumstance, was the law. While the trial was in progress, this court overruled *Carlos* in *Anderson, supra,* 43 Cal.3d 1104. As we later made clear, the rule of *Carlos* applied to cases in which the crime occurred when *Carlos* was in effect. (*People v. Duncan, supra,* 53 Cal.3d at p. 973, fn. 4; *People v. Fauber, supra,* 2 Cal.4th at p. 835.) Under *Carlos,* the standard jury instruction specified, in pertinent part: "To find that the special circumstance, referred to in these instructions as murder in the commission of a robbery, is true, it must be proved: . . . [¶] 2. That the defendant intended to kill a human being." (CALJIC No. 8.81.17 (1984 rev.) (4th ed. Jan. 1987 pocket pt. pp. 130-131).)

In this case, the trial court instructed the jury in terms of the special circumstance without reference to intent to kill. The court then added to the special circumstance instruction the following: "If you find the special circumstance true, you must make a separate finding as to whether the defendant intended to kill a human being at the time of the murder. A special form will be provided for that purpose." The jury was given a special finding form that read: "We find the defendant Michael Joseph Wader intended to kill Maxine Brown. True. Not True." The jury circled "True."

Instructional error, "even with regard to an element of an offense," is measured under the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People v. Odle* (1988) 45 Cal.3d 386, 414 [247 Cal.Rptr. 137, 754 P.2d 184]; *People v. Garrison* (1989) 47 Cal.3d 746, 789 [254 Cal.Rptr. 257, 765 P.2d 419]; see generally *Carella v. California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419].) But with respect to a failure to instruct on intent to kill under *Carlos, supra,* 35 Cal.3d 131, we have stated that no reversible error exists "where the jury necessarily found the requisite intent to kill as a result of other properly given instructions (the so-called *Sedeno* exception) . . . ." (*People v. Leach, supra,* 41 Cal.3d at p. 108, referring to *People v. Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]; see generally *People v. Mincey, supra,* 2 Cal.4th at p. 438.)

This case comes within the *Sedeno* exception. Here, the jury explicitly found that defendant intended to kill the victim when he shot her. Because of that express finding, the trial court's failure to adhere to the precise terms of former CALJIC No. 8.81.17 did not prejudice defendant.

F. *Voluntary Intoxication*

 Defendant contends the trial court erred in not instructing the jury on its own motion on the relevance of voluntary intoxication to the questions

whether defendant had the specific intent to kill the victim, to commit robbery, or to kidnap the victim for the purpose of robbery.

There is some evidence from which the jury could have inferred that defendant was intoxicated at the time of the crimes. Defendant's girlfriend, Mary Kimble, testified that defendant injected cocaine before he left the Los Robles residence on the night of the crimes. And defendant testified that he had "a lot" of cocaine with him in the victim's car, and injected it "all night long." He also testified that he used "crystal meth" on the night of the crimes.

Defendant, however, did not rely on voluntary intoxication as a defense to the specific intent crimes with which he was charged. As we have recently held, a trial court has no duty to instruct on its own motion on voluntary intoxication. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

Defendant also argues that his trial counsel was ineffective in failing to request an instruction on voluntary intoxication. We disagree. Defendant's version of events was that he specifically intended not to kill the victim when he shot her. According to defendant, he did harbor a specific intent when he fired the third and fatal shot—to scare the victim, and nothing more. An instruction on voluntary intoxication as negating specific intent would have been inconsistent with defendant's theory of the case. Accordingly, we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication.

G. *Jury Instruction on Consciousness of Guilt*

The trial court instructed the jury in the terms of CALJIC No. 2.03 (1984 rev.) (4th ed. 1987 pocket pt., p. 8) that "if you find that before this trial the defendant made wilfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. . . ." ▪ Defendant contends the trial court erred in so instructing the jury, because defendant's statements that might be considered false and misleading had no probative value for any contested issue at trial. As we shall explain, the instruction properly directed the jury's attention to testimony tending to show that defendant attempted to divert suspicion from himself to Frank Hillhouse, and that his later inconsistent statements that he did not intend to kill the victim were false.

Defendant testified at trial that when he fired his gun at the victim, he did not intend to kill her. He stated that when she fell to the ground, he thought

she had fainted, and when, after the incident, he read the newspapers and watched television and found no account of a murder, he concluded that he had not killed the victim.

At trial, the prosecution introduced evidence of defendant's statements to San Bernardino County sheriff's deputies, who at that time were unaware of the victim's murder, that Frank Hillhouse, defendant's friend, had a .357 magnum gun, had used it to shoot "an old white broad" in the La Puente area, and had also taken the victim's car. The jury could reasonably conclude that these statements were false and misleading, that defendant attempted to divert suspicion from himself to Hillhouse, and that this attempt tended to show the falseness of defendant's later testimony that he did not intend to kill the victim and did not believe he had killed the victim. Thus, defendant's false statements to sheriff's deputies had a direct bearing on the credibility of his later testimony that he did not intend to kill. The trial court therefore did not err in instructing the jury in the terms of CALJIC No. 2.03, *supra.*

### H. *Jury Instruction on Discrepancies in Testimony*

The trial court gave the jury CALJIC No. 2.20 (1980 rev.) (4th ed. 1984 cum. pocket pt., p. 8), which told the jury it could properly consider the witnesses' prior consistent and inconsistent statements, and "anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of a witness." ▮▮ Defendant claims the trial court had a sua sponte duty to instruct the jury in the terms of the second paragraph of the then-current version of CALJIC No. 2.21 (4th ed. 1979 bound vol.) At the time of trial, the instruction read: "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars. [¶] However, discrepancies in a witness' testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."[5]

Defendant contends the inconsistencies between his statements to the police that were admitted at trial and his trial testimony required the trial judge to instruct the jury on its own motion in the terms of the second

[5]This instruction has been subdivided since the trial in this case; the first paragraph is now CALJIC No. 2.21.2, and the second paragraph is now CALJIC No. 2.21.1.

paragraph of the instruction at issue. We disagree. The requirement that the trial court give sua sponte instructions applies only to those instructions that are " ' "necessary for the jury's understanding of the case." ' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311]; accord, *People* v. *Price, supra*, 1 Cal.4th at p. 442.) As noted above, the jury was given CALJIC No. 2.20, which told the jury it could properly consider the witnesses' prior consistent and inconsistent statements, and "anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of a witness." We conclude that, under the circumstances of this case, the trial court gave the jury the instructions that were necessary to evaluate the testimony of the witnesses, including defendant. The jury was adequately instructed.

## I. *Trial Court's Response to Jury Question About Robbery*

 Defendant argues that his robbery conviction should be reversed because the trial court improperly responded to a question from the jury about the robbery charge.

During deliberations, the jury sent the trial court a note with this question: "Is the stealing of the [victim's] silver car considered a robbery?" In the presence of the jury, the trial judge read this question aloud in court. The judge then told the jury: "[T]he issue is whether there was an intent to permanently deprive. *If you conclude or find that Mr. Wader took the car and intended to return it, then there would not be robbery.* If you conclude or find that when he took the car, that he meant to permanently deprive, there could have been a robbery." (Italics added.) Defendant's counsel then asked for a sidebar conference, during which he suggested that the jury's question could have been directed to the kidnapping-for-robbery count. Thereafter, the trial judge informed the jury: "Ladies and gentlemen, if that question was directed to the 209 count, that is the kidnapping for the purpose of committing a robbery, then the intention to permanently deprive that's the issue we have been talking about, has to be present at the time the movement of the car commenced. At the time he got in the car and the car began to move."

Defendant characterizes the trial court's response to the jury's question as "potentially misleading." He focuses on the court's statement, italicized above, "If you conclude or find that Mr. Wader took the car and intended to return it, then there would not be robbery." According to defendant, the most plausible interpretation of the evidence is that when he took the victim's car, he intended to use it to commit other crimes and then to abandon it. Under this scenario, he would not have intended to permanently deprive the victim of her car when he took it, but he would not have intended to return it to her

either. Under these facts, defendant asserts, he would not be guilty of robbery. But, defendant argues, the trial court's response to the jury misleadingly indicated that on these facts he would be guilty of robbery.

We perceive no error in the trial court's response to the jury. The prosecution retained the burden of proving beyond a reasonable doubt that defendant intended to permanently deprive the victim of her car at the time the car was put in motion. Nothing in the court's reply to the jury's question altered the prosecution's burden of proof. Nor did the court's response tell the jury that if defendant intended to abandon the car and not return it to the victim, defendant would be guilty of robbery. Considered in context, the trial court's comment of which defendant complains—"[i]f you conclude or find that Mr. Wader took the car and intended to return it, then there would not be robbery"—was correct.

## J. *Trial Judge's Pretrial Comments*

Defendant contends that, before the presentation of evidence, the trial court took three steps that "improperly tended to influence the jury in the direction of a verdict of guilt." Specifically, defendant contends the trial court erred by (1) reading to the prospective jurors the information that mentioned four robbery counts that were later severed; (2) implying that a decision by defendant to call witnesses was a concession that the prosecution had met its burden of proof; and (3) using in voir dire only "death qualification" hypotheticals that assumed defendant was guilty.

### 1. *Reading Information to Jury Pool*

When first addressing the pool of prospective jurors, the trial court stated: "This case alleges a count of first degree murder and several counts of robbery." Later, the court read the information, including all four robbery counts, to the jury pool. Two weeks later, the robbery counts were severed. ▉▉▉ The record shows that defense counsel failed to object either to the reference to the robbery counts or the reading of the information that included the robbery counts. Accordingly, the issue has not been preserved for review. (*People v. Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, the reading of the information could not have influenced the jury, and was therefore harmless under any standard.

### 2. *Defendant's Decision to Call Witnesses*

Before the presentation of evidence began, the trial court explained to the jury the procedure of a criminal trial. In part, the trial court stated:

"After the prosecution has presented their [sic] witnesses and the defense has cross-examined them, then the defense has the opportunity to present witnesses, if they wish to do so. I don't know in this case what decision the defense has made. They may decide not to present any evidence. There are a number of reasons why testimony may not want [sic] to be presented by the defense or why they may not want to call the defendant. One [of] those may be that they understand that the rule is that the prosecution has the responsibility of presenting sufficient evidence to convict the defendant, and that standard being beyond a reasonable doubt.

"They may wish to take the position, or they may take the position that the People have not proven their case, that they have not proven that defendant is guilty beyond a reasonable doubt and may decide not to present evidence for that reason, or for any other reason.

"Should they elect to present evidence and present testimony then the district attorney has the same opportunities to cross-examination [sic] as the defense did. . . ."

 Defendant argues that the trial court's explanation indicated to the jury that a decision by a defendant to call witnesses is a concession that the prosecution has met its burden of proving guilt beyond a reasonable doubt.

We reject this argument. First, defendant failed to object to the trial court's explanation; therefore, the issue has not been preserved for appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 27.) Moreover, the trial court's explanation, taken in context, does not amount to error. Rather, the court's explanation somewhat inartfully indicated that there are a variety of reasons why a defendant may choose not to present evidence. Before the jury began its deliberations, the court instructed the jury that defendant was presumed innocent and that the prosecution had the burden of proving defendant guilty beyond a reasonable doubt. On this record, any confusion was dispelled by later, correct jury instructions.

3. *Use of "Death Qualification" Hypotheticals*

 In examining prospective jurors on their attitudes toward the death penalty ("death-qualifying" the jury) under *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], the trial court used only hypotheticals that assumed defendant was guilty. Defendant now contends that these hypotheticals improperly biased the jury toward conviction.

Defendant overlooks that, in "death-qualifying" the jury, unless the jurors assume that a defendant is found guilty, they will have no reason to consider the question of an appropriate penalty. Accordingly, in determining the jurors' willingness to vote for the death penalty in an appropriate case, the hypotheticals necessarily must assume that the accused is guilty. Here, the court's hypotheticals were not improper.

### K. *Separate Guilt and Penalty Phase Juries*

During jury selection, the trial court excluded three jurors for cause because they said that in view of their religious beliefs they would not be able to vote for the imposition of capital punishment. ▮▮▮ Defense counsel suggested that the trial court allow jurors excluded for cause under *Wainwright* v. *Witt, supra,* 469 U.S. 412, to sit on the guilt phase jury and that alternate jurors be substituted for these "guilt-phase includable" jurors at the penalty phase, if there was one. The trial court declined this invitation, and defendant asserts it was error to do so. We disagree.

Defendant's argument is inconsistent with section 190.4, subdivision (c), which provides that the same jury that determines guilt shall also determine "the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn."

Moreover, this court rejected a virtually identical argument in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. We determined there that the state's interest in assuring that "the decision-making process of a death penalty case is a coherent whole" outweighed "those interests asserted in favor of permitting the 'guilt phase includables' to serve on the jury which tries guilt and special circumstance." (*Id.* at p. 352; see *People* v. *Taylor* (1990) 52 Cal.3d 719, 738 [276 Cal.Rptr. 391, 801 P.2d 1142].) Defendant advances no compelling reason for us to reexamine this holding.

### III. PENALTY PHASE FACTS

### A. *Prosecution's Penalty Phase Evidence*

At the penalty phase, the prosecution presented evidence relating to four armed robberies committed by defendant, as well as evidence concerning two rapes and two nonviolent crimes of which defendant had been convicted.

### 1. *The Sizzler Robbery*

On October 8, 1984, Thomas Beran was the manager of a Sizzler restaurant in Pico Rivera in Los Angeles County. At 7:30 p.m. that day, a man

Beran identified as defendant walked up to the cash register and told Beran to hand over the money in the cash register. Defendant had a gun in his waistband. Beran opened the register and handed defendant about $200 in bills. Defendant took the gun out of his waistband and left. Shortly afterwards, Beran heard a sound like a gunshot.

2. *The Numero Uno Robbery*

On October 12, 1984, Anita Chan worked at a Numero Uno pizzeria in San Gabriel, County of Los Angeles. At 10:30 p.m., a person Chan identified as defendant came in and ordered a pizza. Chan wrote the order down and, when she looked up, defendant was pointing a gun at her. Defendant demanded all the money in the cash register. Chan handed defendant about $300.

3. *The Kentucky Fried Chicken-Alhambra Robbery*

On October 15, 1984, Laurie Grasser worked at a Kentucky Fried Chicken restaurant in Alhambra in Los Angeles County. A man entered, and Grasser asked her coworker Robert Gonzales to wait on him. As Grasser was taking some dirty dishes to the back, she heard a gunshot. When she turned around, the man was gone. She called the police. Grasser described the robber to the police, but she could not identify him at trial.

Grasser's coworker Robert Gonzales testified he was working at the front counter that evening when a man came in, placed an order, then pulled out a gun and pointed it at Gonzales. The man told Gonzales to give him the money in the cash register, and Gonzales did so. The man ran toward the front door, and Gonzales turned toward the rear. Gonzales then heard a shot. Gonzales later saw a bullet hole in the counter close to the floor. Gonzales was unable to identify the robber at trial.

4. *The Kentucky Fried Chicken-San Gabriel Robbery*

On November 13, 1984, Deanne Limon worked at a Kentucky Fried Chicken restaurant in San Gabriel in Los Angeles County. That evening, a man Limon identified as defendant came to the counter, displayed a gun in his waistband, and demanded money. Limon handed defendant about $80 from the cash register. Defendant then left.

5. *Defendant's Statements to Deputy Gerlach*

On December 11, 1984, Deputy Dieter Gerlach, a robbery investigator for the Los Angeles County Sheriff's Department, interviewed defendant at the

San Bernardino County jail. Defendant admitted committing the robbery of the Kentucky Fried Chicken restaurant in Alhambra on October 15, 1984, the robbery of the Sizzler restaurant in Pico Rivera on October 8, 1984, and the robbery of the Kentucky Fried Chicken restaurant in San Gabriel on November 13, 1984. Defendant said he thought he had committed the robbery of the Numero Uno pizzeria on October 12, 1984, but was not positive. On February 12, 1985, when Deputy Gerlach again interviewed him, defendant confirmed that he had robbed the Numero Uno pizzeria.

### 6. *Rape and Assault of Antoinette R.*

The parties stipulated that in July 1972, defendant had pleaded guilty to violations of section 261, subdivision (a)(2) (rape by force) and section 245 (assault with a deadly weapon or assault with force likely to produce great bodily injury) against Antoinette R., and that the victim was unavailable to testify at trial. The victim's mother, Marilyn G., testified that her daughter was 14 years old at the time of these crimes, and she described her daughter's appearance before the rape and after it. Marilyn G. identified a photograph of her daughter taken five to seven days after undergoing reconstructive facial surgery as a result of injuries inflicted in the course of the rape.

### 7. *Other Prior Felony Convictions*

In addition to the crimes against Antoinette R., the parties stipulated that defendant had pleaded guilty to one count of rape by threat of force in violation of section 261, subdivision (2) against Kathryn Mary D. on November 10, 1971. The parties also stipulated that defendant had pleaded guilty to forgery in violation of section 470 in 1980, and to possession of marijuana on state-controlled grounds in violation of section 4573.6 in September 1984.

### B. *Defendant's Penalty Phase Evidence*

### 1. *Testimony by Defendant's Relatives and Friends*

Defendant's father, Dave Wader, testified that his wife, Rachel Wader, gave birth to defendant in 1946 in San Diego, and that when defendant was 18 months old, Rachel "just took off," after which neighbors took defendant into their home. Defendant later lived with Dave's brother in Detroit. In 1950, when defendant was four years old, Dave Wader remarried. He and his new wife, Helen, then had defendant live with them in San Diego. At age 13, defendant began running away from home. As a teenager, defendant spent a

lot of time hitchhiking across the country. One day, in the late 1970's, Dave Wader was on a river fishing trip with defendant when a boat with three children in it capsized. Defendant swam across the river and saved the children. Also, when Dave Wader's father and father-in-law were ill, defendant took care of them.

Helen Wader, defendant's stepmother, testified that defendant was four years old when he came to live with her in San Diego. When defendant was about 12 years old, Helen gave birth to a daughter, and defendant's behavior then changed. He began a pattern of running away and getting in trouble. During his teenage years, defendant received psychiatric help. When Helen's father became ill, defendant took care of him, and her father "adored" defendant.

Beatrice Mungie, the mother of defendant's stepmother, described defendant as a normal and affectionate child. When her husband was ill with cancer, defendant took care of him and was "very gentle" with him.

Robert Mungie, the brother of defendant's stepmother, was a salesperson and a Baptist minister who had spent 30 years in the Navy and had substantial experience as a counselor. He first met defendant when defendant was about five or six years old, and observed him as he grew up. Defendant was an unwanted and abandoned child, and had a rough life. Defendant's father and stepmother were "very abusive" to him. When defendant as a child would talk back or do something wrong, his father and stepmother would hit him, often with their fists, or kick him. This was a regular occurrence. Robert Mungie characterized the hitting as abuse, noting, "You don't hit a kid with your fist and call it discipline." Defendant became fearful and submissive. Robert Mungie tried to talk to defendant's father and stepmother about their treatment of defendant, but they were "very stubborn" people.

William Wader, defendant's uncle, testified he had known defendant since defendant's birth. As a child, defendant suffered a head injury that affected his eyesight. Defendant's stepmother displayed no affection toward defendant. Instead, she would discipline him roughly, beating him on the head.

Carrie Kleiboker was 15 or 16 years old when she met defendant in 1980 or 1981. At that time, her mother had injured herself and had to lie flat on her back. Defendant helped out around the house, bringing them food and otherwise assisting the family for three or four months. Carrie Kleiboker's testimony was corroborated by her mother, Norma Roach, and her sister, Lori Duffet.

Mary Kimble, defendant's girlfriend, testified that she introduced defendant to Nona Dingley, a woman in her 80's who was blind and ill. Defendant brought Dingley groceries, took her out to dinner, and "did whatever he could for her." Defendant also helped Kimble with her son, who had been molested by his father and would not talk about it. Defendant was the only person who was able to get the boy to talk about the experience, and encouraged him to talk to a psychiatrist. According to Kimble, defendant was a positive influence in her son's life.

### 2. *Associate Warden James Park*

James Park, a correctional consultant who had 35 years of experience with prison management and operations, and had been an associate warden at two California prisons, described maximum security imprisonment in California. He testified that maximum security prisoners can be managed with a high degree of safety for staff and other prisoners, and that prisoners with long-term sentences are generally a stabilizing influence in the prison community.

### IV. PENALTY PHASE DISCUSSION

### A. *Exclusion of Prospective Juror Kosmatka*

The prosecutor challenged prospective juror Gary Kosmatka for cause, and the trial court excluded him. Defendant contends Kosmatka's exclusion compels reversal of the judgment of death. We reject the contention.

When the prosecution seeks to exclude a prospective juror for cause because of the juror's views on capital punishment, under *Wainwright* v. *Witt, supra,* 469 U.S. 412, the trial court must determine whether "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at p. 851].) " 'Under *Witt,* therefore, our duty is to "examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would 'substantially impair the performance of his duties . . .' was fairly supported by the record." ' " (*People* v. *Wharton* (1991) 53 Cal.3d 522, 587 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 129 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

Here, the trial court's determination that prospective juror Kosmatka's beliefs would substantially impair his performance as a juror is

fairly supported by the record; thus the juror was properly excused for cause. During voir dire, Kosmatka was extensively questioned by the trial court, the prosecutor, and defense counsel. The court asked Kosmatka whether, if he believed the special circumstance of robbery-kidnapping to be true, he would vote "not true" in order to avoid the death penalty issue. Kosmatka replied he was a Catholic, explaining, "I do not know if I can reconcile a death penalty along with my faith." In response to a question by the court regarding a hypothetical premeditated murder of a nun to eliminate her as a witness, Kosmatka said he did not think he could vote for the death penalty in that case. In later questioning, Kosmatka said he could possibly vote for the death penalty in a case that was "outrageous" and involved the murder of a member of his family or a close friend, but that would involve violating his beliefs. Finally, the trial court asked Kosmatka: "[Y]ou are saying 'Judge, I am telling you I have charged my conscience and I know at this point that I would not vote for the death penalty in this case. Period, end of report.' Are you telling me that?" Kosmatka answered, "Yes." In this instance, we perceive no violation of the standards of *Wainwright* v. *Witt, supra,* 469 U.S. 412.[6]

## B. *Interrogations By Deputy Gerlach*

The complaint charging defendant with capital murder was filed on December 5, 1984. On December 11, 1984, Deputy Dieter Gerlach of the Los Angeles County Sheriff's Department interrogated defendant about four robberies committed before the murder of Maxine Brown. Before Gerlach began his questioning, defendant orally and in writing indicated he wanted to talk about the robberies and did not want a lawyer. On February 13, 1985, defendant was arraigned on the capital charge, and counsel was appointed for him the next day. The complaint in the capital case was later amended to charge defendant with the four robberies.

At the penalty phase of defendant's trial, Deputy Gerlach testified to the statements defendant had made to him admitting involvement in the four robberies.

 Defendant now contends that his Sixth Amendment right to counsel was violated by Gerlach's interrogation of him after the capital charge was

---

[6]Defendant also argues that a hypothetical question asked of prospective juror Kosmatka by the prosecutor was improperly case-specific. (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 784-785]; *People* v. *Fields, supra,* 35 Cal.3d 329, 358, fn. 13.) Defendant failed to object to the assertedly improper question, however, and thus the issue is not preserved for appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.) In any event, the question did not inform the jury of the *evidence* to be presented; the questions merely recited the nature of the charge at issue—murder in the course of a robbery.

filed, and that the admission at the penalty phase of defendant's statements to Gerlach was prejudicial error. This issue is not properly before us. Because defendant failed to object to the admission of his statements to Gerlach either before trial or at the time of Gerlach's penalty phase testimony, the issue was not preserved for our review. (Evid. Code, § 353; see, e.g., *People* v. *Coleman* (1988) 46 Cal.3d 749, 777 [251 Cal.Rptr. 83, 759 P.2d 1260].)

 Defendant alternatively contends that his trial counsel's failure to raise this Sixth Amendment issue deprived him of effective assistance of counsel. We disagree. Even if defendant's counsel had raised this issue, the trial court would not have been required to exclude Deputy Gerlach's testimony.

The Sixth Amendment right to counsel attaches when adversary judicial criminal proceedings with respect to a particular offense have been initiated. (*McNeil* v. *Wisconsin, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 166, 111 S.Ct. at p. 2207]; accord, *People* v. *Clair* (1992) 2 Cal.4th 629, 657 [7 Cal. Rptr.2d 564, 828 P.2d 705].) Here, such proceedings in the capital case had been initiated before Detective Gerlach's interrogation. But the Sixth Amendment does not prohibit all police interrogations on related matters after adversary proceedings have been initiated. Rather, the high court has made clear that "once this right to counsel has attached *and has been invoked*, any subsequent waiver during a police-initiated custodial interview is ineffective." (*McNeil* v. *Wisconsin, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 166, 111 S.Ct. at p. 2207], italics added.) Although in this case the Sixth Amendment right to counsel had attached in the capital case at the time of the interview, defendant fails to demonstrate that it had been invoked. The record does not show that defendant asked for a lawyer to represent him in the capital case at or before his interview with Gerlach. Accordingly, no Sixth Amendment violation has been demonstrated.[7]

---

[7]Nothing in the record indicates that the prosecution delayed arraigning defendant on the murder charge for the purpose of questioning him about the robberies. (See generally *People* v. *Williams* (1977) 68 Cal.App.3d 36, 44 [137 Cal.Rptr. 70].)

Defendant also contends that this case comes within an exception to the offense-specific requirement of the Sixth Amendment, citing *United States* v. *Hines* (9th Cir. 1992) 963 F.2d 255. There, the Ninth Circuit held that "[a]n exception to the offense-specific requirement of the Sixth Amendment occurs when the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." (*Id.* at p. 257.) This exception, however, does not aid appellant, because it does not apply when the uncharged offenses are "logically distinct" from the charged offense. (*Ibid.*) Here, the robberies were distinct from the charged offenses; the places, times, and victims were all different.

## C. *Admission of Prior-rape Evidence*

The parties stipulated that in July 1972 defendant had pleaded guilty to violations of section 261, subdivision (a)(2) (rape by force) and section 245 (assault with a deadly weapon or assault by means of force likely to produce great bodily injury) against Antoinette R., and that the victim was unavailable to testify at trial. As mentioned earlier, the victim's mother, Marilyn G., testified regarding her daughter's physical appearance before and after the rape. At trial, she identified a photograph of her daughter taken five to seven days after she had undergone reconstructive facial surgery as a result of injuries sustained in the course of the rape. This photograph was admitted into evidence over defendant's objection. ■ Defendant contends the trial court's admission of the photograph was in error, because the photograph was not relevant and was, in any event, more prejudicial than probative. We disagree.

Generally, photographs that show the manner in which a victim was wounded are relevant to the determination of malice, aggravation and penalty. (*People* v. *Milner* (1988) 45 Cal.3d 227, 247 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Raley* (1992) 2 Cal.4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Here, the photograph was relevant to the prosecution's penalty phase case under factor (b) of section 190.3, as it tended to show criminal activity by the defendant that involved the use of force or violence. The evidence was particularly relevant to show the extreme violence defendant used on the 14-year-old rape victim. (*People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 758 P.2d 1060].) The trial court properly determined that the fact that the photograph was taken following the victim's reconstructive surgery went to the weight, rather than the admissibility, of the photographic evidence.

Moreover, we find no abuse of discretion in the trial court's ruling that the photograph was not substantially more prejudicial than probative under Evidence Code section 352. The photograph, which we have examined, is not "unduly gruesome." (*People* v. *Milner, supra,* 45 Cal.3d at p. 247; *People* v. *Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351].) Although it is true that the photograph itself could not reveal to what extent the victim's facial swelling and discoloration directly resulted from defendant's attack and not from the victim's later surgery necessitated by the attack, defendant's counsel was free to cross-examine the victim's mother on this point, and counsel did suggest to the jury that it should take this uncertainty into consideration. In any event, the victim's mother testified that, after the attack but apparently before the victim's surgery, the victim's mouth and cheekbones were severely swollen, and her right eye was swollen

shut. This testimony enabled the jury to evaluate to what extent the photograph in question reflected the trauma of the assault rather than the effects of the surgery.

Defendant had originally been charged with a violation of the 1970 version of section 264 (rape with commission of great bodily injury) for his attack on Antoinette R., but this charge was dismissed as part of a plea bargain. Defendant contends that exhibit 31 and all of the testimony given by Marilyn G., the mother of rape victim Antoinette R., were inadmissible because use of the facts underlying the dismissed charge was a breach of the plea bargain and a violation of double jeopardy principles.

We have repeatedly rejected virtually identical double jeopardy claims (see, e.g., *People v. McDowell, supra,* 46 Cal.3d at p. 568; *People v. Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741]), and we decline to revisit this issue. We have also rejected the argument that the use at a penalty phase of facts underlying a charge dismissed as part of a plea bargain is precluded by the plea bargain agreement (*People v. Frank* (1990) 51 Cal.3d 718, 728-729 [274 Cal.Rptr. 372, 798 P.2d 1215]; see *People v. Pride* (1992) 3 Cal.4th 195, 257 [10 Cal.Rptr.2d 636, 833 P.2d 643]), and defendant offers no compelling reason to reconsider the question.

Defendant additionally argues that this court's holding in *People v. Melton, supra,* 44 Cal.3d 713, 754, that the use of facts underlying a prior conviction as aggravating evidence at a capital case penalty trial is permissible conflicts with *People v. Guerrero* (1988) 44 Cal.3d 343, 355 [243 Cal.Rptr. 688, 748 P.2d 1150], in which this court held that the facts underlying a prior conviction could not be relitigated in the context of enhancements under section 667. We have previously rejected a similar contention (*People v. McDowell, supra,* 46 Cal.3d at p. 568; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242-1243 [14 Cal.Rptr.2d 702, 842 P.2d 1]), and decline to reconsider the issue.[8]

## D. *Use of Robbery Evidence at Penalty Phase*

As noted earlier, the four robbery counts with which defendant had originally been charged were severed before the guilt phase trial began.

---

[8]In support of his argument defendant also cites *Taylor v. United States* (1990) 495 U.S. 575 [109 L.Ed.2d 607, 110 S.Ct. 2143], which held that for purposes of certain sentence enhancements under federal law, the federal courts should look only to the record of the conviction. *Taylor* contains language about the "practical difficulties and potential unfairness of a factual approach . . . ." (*Id.* at p. 601 [109 L.Ed.2d at p. 628].) *Taylor,* of course, is not binding on this court because it concerns federal statutory interpretation, not constitutional principles.

■ At the penalty phase, the prosecution introduced evidence regarding those robberies. Defendant contends this unconstitutionally forced him to choose between testifying about four charged but severed robbery counts or remaining silent at the penalty phase.

In *People* v. *Caro* (1988) 46 Cal.3d 1035, 1056 [251 Cal.Rptr. 757, 761 P.2d 680], we rejected a virtually identical contention, relying on *McGautha* v. *California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454]. Defendant seeks to distinguish *Caro* on the basis that, unlike the defendant in *Caro* who faced no pending charges on the crimes as to which he contended he was forced to testify, here defendant was actually facing pending charges on the robbery counts. The defendant in *Caro* challenged the "introduction of evidence of killings for which he might at some future date be tried . . . ." (*People* v. *Caro, supra,* 46 Cal.3d at p. 1055.) The possible consequences of defendant's choice to testify or not are identical here. Moreover, if defendant had testified at the penalty phase, but not testified about the robberies on direct examination at the penalty phase, "any attempt to cross-examine him on that subject would not have survived a timely objection as to scope." (*Id.* at pp. 1056-1057.)

E. *Instruction on Factors as Aggravating and Mitigating*

In conformance with Penal Code section 190.3 and the standard penalty phase jury instruction, CALJIC No. 8.84.1 (1986 rev.) (4th ed. 1987 pocket pt., pp. 135-136), the trial court instructed the jury that, in determining the penalty, it must consider and be guided by 11 factors, if applicable. The trial court added: "The factors which I have just listed for you may be considered by you, if applicable, as either aggravating factors or mitigating factors. [¶] If you find any of these factors to be aggravating, and to have been established by the evidence, you may consider them in determining the penalty you will impose in this case."

■ Defendant contends this instruction was erroneous. He is correct. A majority of the 11 statutory factors can only be mitigating. (See, e.g., *People* v. *Gallego* (1990) 52 Cal.3d 115, 200 [276 Cal.Rptr. 679, 802 P.2d 169] [§ 190.3, factors (e), (f), (g) and (j)]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 654 [274 Cal.Rptr. 252, 798 P.2d 849] [§ 190.3, factors (d), (e), (f), (h) and (k)]; but see *People* v. *Proctor* (1992) 4 Cal.4th 499, 553 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [whether § 190.3, factor (j) can only be mitigating is undecided].) The Attorney General, however, argues that, because the two-paragraph instruction (quoted in the preceding paragraph) was requested by the defense, any error was invited and cannot be raised on appeal under the doctrine of invited error.

When a defense attorney makes a "conscious, deliberate tactical choice" to forego a particular instruction, the invited error doctrine bars an argument

on appeal that the instruction was omitted in error. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 831 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Duncan, supra,* 53 Cal.3d at p. 970.) When defense counsel makes an equally conscious and deliberate tactical choice to request a particular instruction—such as the instruction defense counsel specifically requested here—there is no reason to apply a different rule. Accordingly, we conclude the error was invited, and defendant cannot raise it on appeal.

 Even a deliberate tactical choice by counsel, however, may be an incompetent one. Thus, we have also recognized that a defendant who is barred from raising instructional error by the invited error doctrine may "always claim he received ineffective assistance of counsel." (*People* v. *Cooper, supra,* 53 Cal.3d at p. 831.) Defendant does so here.

 To prevail on a claim of ineffective assistance of counsel on appeal, the defendant must show that there was no rational tactical purpose for counsel's act or omission, and that it is reasonably probable that, absent counsel's deficiencies, a more favorable result would have been obtained. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 690, 694 [80 L.Ed.2d 674, 695, 697, 104 S.Ct. 2052]; *In re Wilson, supra,* 3 Cal.4th 945, 950; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1057-1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) Although no tactical purpose for requesting the instruction on aggravating and mitigating factors appears on the face of the record, we cannot determine on the record alone whether counsel could have had no rational tactical purpose for requesting this instruction. Accordingly, based on this record, we must reject defendant's claim of ineffective assistance of counsel.

F. *Prosecutor's Argument Regarding Factor (k) Evidence*

Section 190.3 requires the jury at the penalty phase to take into account evidence on a number of factors, including "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Defendant contends that the prosecutor in her penalty phase closing argument wrongly argued that the evidence defendant had presented under factor (k)—that he was capable of selfless acts to help vulnerable people—showed the death penalty was appropriate because defendant had demonstrated he was capable of living a constructive life but had chosen not to do so. We express no view as to whether this argument by the prosecutor was improper (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1]; see *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d

861]), because defendant failed to object at trial to the asserted misconduct. We have held that if a timely objection and admonition would have cured any misconduct, then a failure to object precludes examination of the assertedly objectionable argument on appeal. (See, e.g., *People* v. *Sully* (1991) 53 Cal.3d 1195, 1248 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Green, supra,* 27 Cal.3d at p. 27.)

Here, even if we assume for the purpose of analysis that the prosecutor's argument was improper, an objection by defendant's counsel and an admonition by the trial court to the jury, explaining that defendant's background and history of positive character traits and selfless acts could not be considered as aggravating, would have cured any harm resulting from the prosecutor's argument. Thus, the failure to object precludes defendant from now raising this issue.[9]

G. *Refusal to Give Instruction Defining Aggravating and Mitigating Factors*

Defendant submitted this jury instruction at the penalty phase: "Aggravating factors are facts attending the commission of a crime which increase its guilt or enormity or add to its injurious consequences, but which are above and beyond the essential constituents of the crime itself. [¶] Mitigating factors are circumstances which do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."

The trial court refused to give the requested instruction. Defendant contends this was error. Such an instruction may well have assisted the jury in evaluating the statutory circumstances in aggravation and mitigation. (*People* v. *Malone, supra,* 47 Cal.3d 1, 54-55.) Nevertheless, the trial court did not err in refusing to give this instruction. The instruction defined the terms "aggravating" and "mitigating." As we explained in *Malone*: " 'Aggravation' and 'mitigation' are commonly understood terms. A trial court is not required to instruct on the meaning of terms that are commonly understood. [Citation.]" (*Id.* at p. 55.)

[9]Defendant also contends the prosecutor wrongly argued that the absence of certain mitigating factors was a factor in aggravation, in violation of this court's holding in *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290. For the most part, defendant is incorrect; the prosecutor merely argued that the absence of mitigating factors weighed against leniency. The prosecutor did argue, however, that the lack of evidence under factor (d) of Penal Code section 190.3, relating to extreme mental disturbance, "just tells us a little bit more about defendant's character." Although this argument was improper, defendant failed to object to it. Because the issue has not been preserved for appeal, we will not address it. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

H. *Prosecutor's Argument on Rehabilitation*

At the start of her argument at the penalty phase, the prosecutor told the jury that there were several goals of sentencing: to protect society, to punish, and to rehabilitate. She described rehabilitation as "one of the least important [goals] now because it has been relegated to the lower standard, at least a lower level because of problems in the past," adding, "rehabilitating is not really an issue here because of the two considerations we're talking about." Defendant now contends that this comment was prosecutorial misconduct because it told the jurors they were to ignore the evidence of defendant's potential for rehabilitation in prison.

There was, however, no objection to this brief comment by the prosecutor. Even assuming that this comment amounted to misconduct, a timely objection by the defense and an admonition by the trial court informing the jury that it could consider defendant's performance in prison and the prospect of his rehabilitation there would have cured any harm. Accordingly, the issue is not properly before us. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.) If the issue had been preserved, we would find any misconduct harmless on this record.

I. *Trial Court's Failure to Instruct on Intent to Kill, and Defense Counsel's Argument on Lingering Doubt*

As explained earlier, this case is governed by *Carlos, supra,* 35 Cal.3d 131, which required that the jury find intent to kill as a prerequisite to a special circumstance finding. Here, the trial court did not instruct the jury that it must find intent to kill, but the court did submit to the jury an interrogatory on this issue, and the jury expressly found that defendant intended to kill the victim when he shot her. Defendant contends that the trial court's failure to direct the jury that it must find intent to kill before it could find him guilty of the felony-murder special circumstance prevented the jury from understanding the significance of his counsel's argument on lingering doubt at the penalty phase.

Defendant's counsel did emphasize to the jury in her closing argument at the penalty phase that it could consider any lingering doubt regarding defendant's intent to kill. But the trial court's failure to instruct the jury that it must find intent to kill did not discourage the jury from considering this argument. Eighth Amendment concerns are satisfied when a capital defendant is not deprived of the opportunity to present evidence on lingering doubt and to have the jury weigh this evidence. "The fair opportunity to present relevant [lingering doubt] evidence and to argue forbearance thereon sufficiently preserves the defendant's interest in having the jury consider fully all

germane aspects of the offense and the offender . . . ." (*People* v. *Cox, supra*, 53 Cal.3d 618, 677, citing *Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 177-180 [101 L.Ed.2d 155, 167-169, 108 S.Ct. 2320]; see generally *People* v. *Fauber, supra*, 2 Cal.4th 792, 864.) Because here defendant was not prevented from presenting evidence on lingering doubt or arguing its significance to the jury, we reject his contention.

## J. *Alleged Failure to Read Back Testimony to Jury*

Under section 1138, the jury has a right to rehear testimony during its deliberations. During penalty phase deliberations, the jury asked to rehear the testimony of defense witnesses Dave Wader (defendant's father), William Wader (defendant's uncle), Helen Wader (defendant's stepmother), and Robert Mungie (brother of defendant's stepmother). ██ Defendant contends that the penalty phase verdict may be unreliable because it is "unclear" whether the testimony the jury sought to rehear was indeed read back to the jury.

Neither the clerk's transcript nor the reporter's transcript definitively shows that the jury's requested "readbacks" of the testimony in question occurred. But approximately one and one-half years after trial, the trial court and all counsel discussed this matter at a hearing on defendant's motion to correct, augment and settle the record. None could recall specifically whether or not the testimony at issue had been read back to the jury. The trial court stated, however: "I can tell you that those portions of the testimony were in fact reread based on what my common practice is. And I think that both counsel will agree that in all probability, that happened. To a certainty, I would say." The proposed settled statement reflects that the trial judge accompanied the court reporter into the jury room and asked the court reporter to read back the requested testimony, and then left the room.[10] It is reasonable to assume that the court reporter did reread the testimony to the jury, as the trial court apparently instructed.

"It is presumed that official duty has been regularly performed. . . ." (Evid. Code, § 664.) This presumption applies to actions by trial judges and court clerks. (E.g., *People* v. *Mitcham, supra*, 1 Cal.4th 1027, 1056-1057; *Younesi* v. *Lane* (1991) 228 Cal.App.3d 967, 974 [279 Cal.Rptr. 89]; see *In re Marriage of Patscheck* (1986) 180 Cal.App.3d 800, 803[225 Cal.Rptr. 787].) We see no reason why it should not apply to court reporters as well. In light of this presumption and in the absence of any showing that the readbacks did not in fact take place, we find no error.

---

[10]The record contains a proposed settled statement, but not one approved by the trial court.

### K. *Jury Instruction on Scope of Jury's Sentencing Discretion*

■ The trial court instructed the jury on the scope of its sentencing discretion in the terms of CALJIC No. 8.84.2 (1986 rev.) (4th ed. 1987 pocket pt., pp. 140, 141).[11] Defendant contends this instruction was erroneous, for three reasons.

First, defendant contends this instruction was defective for not telling the jurors that unless they found that the factors in aggravation outweighed the factors in mitigation, they could not impose a sentence of death. We upheld the propriety of a similar instruction in *People* v. *Duncan, supra,* 53 Cal.3d 955, 978, saying, "The instruction clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating."

Second, defendant argues that the instruction was flawed in that it failed to tell the jurors that if mitigation outweighed aggravation, a sentence of life without parole was required. This argument too we rejected in *People* v. *Duncan, supra,* 53 Cal.3d at page 978; we see no reason to reconsider it.

Third, defendant focuses on this sentence from CALJIC No. 8.84.2 (1986 rev.) (4th ed. 1987 pocket pt., p. 141): "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole." (Italics added.) Defendant complains that the term "so substantial" is impermissibly vague. We rejected a virtually identical argument in *People* v. *Sully, supra,* 53 Cal.3d at pages 1244-1245. Also, contrary to defendant's contention, the quoted sentence did not create "a presumption in favor of [imposing] death." (See *People* v. *Raley, supra,* 2 Cal.4th at p. 920.) A fair and reasonable reading of this sentence is that if the jurors are not persuaded that the aggravating circumstances are not so substantial in comparison with the mitigating circumstances, the jury should return a verdict of life without the possibility of parole. There is no

---

[11]The instruction given to the jury provided:

"It is now your duty to determine which of two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole."

reasonable likelihood that the jury would have understood this sentence in the manner defendant suggests. (See *Boyde* v. *California* (1990) 494 U.S. 370, 382 [108 L.Ed.2d 316, 330, 110 S.Ct. 1190].)

### L. *Additional Penalty Phase Instructional Issues*

Defendant argues there were several additional instructional errors, each of which requires reversal of the penalty phase judgment.

#### 1. *"Mercy" Instruction*

Defendant asserts that the trial court erred in failing to give his proffered "mercy" instruction. The trial court did, however, instruct the jury it was to consider, if applicable, "any sympath[y] . . . that the defendant offers as a basis for a sentence less than death . . . ." The prosecutor did not argue to the jury that it should not consider sympathy or mercy. Under these circumstances, there was no error. (*People* v. *Caro, supra,* 46 Cal.3d at p. 1067; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 781-782 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

#### 2. *Nonpertinent Factors*

According to defendant, the trial court reversibly erred when it failed to delete nonpertinent factors under section 190.3 from the penalty phase instructions. We have repeatedly rejected this contention in other cases. (*People* v. *Cooper, supra,* 53 Cal.3d 771, 843; *People* v. *Malone, supra,* 47 Cal.3d 1, 47.)

#### 3. *Constitutionality of Factor (a) Instruction*

In conformance with section 190.3, the trial court instructed the jury to "consider, take into account and be guided by the following factors, if applicable: [¶] (a) the circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." Defendant contends that this instruction is so vague as to render the sentencing determination unreliable, arbitrary and capricious, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and that the trial court improperly refused a proffered clarifying instruction. (See *Godfrey* v. *Georgia* (1980) 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759].)[12]

We considered a similar argument in *People* v. *Wright* (1990) 52 Cal.3d 367, 444-446 [276 Cal.Rptr. 731, 802 P.2d 221]. There, the defendant

---

[12]A related issue—whether section 190.3's aggravating factors, considered by the jury in determining penalty, are subject to Eighth Amendment vagueness analysis—is before us in a

argued that the trial court's refusal to give an instruction clarifying the meaning of the phrase "circumstances of the crime" permitted the jury to impose the death penalty based on constitutionally irrelevant factors, such as whether the crime was particularly gruesome. We held that the standard jury instruction on " 'circumstances of the crime' " required no further "characteriz[ation] or elaborat[ion]." (*Id.* at p. 446.) More recently, in *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142], we held that section 190.3, factor (a) was "not 'illusory' or otherwise impermissibly 'vague' . . . ." Accordingly, we reject defendant's argument.

### 4. *Jury Instruction on Possibility of Deadlocked Jury*

■ Defendant faults the trial court for its refusal to instruct the jury, on his request, that it was not required to reach a penalty verdict, and that "[t]he possibility of a hung jury is an inevitable by-product of the requirement that a verdict must be unanimous." We have previously rejected the proposition that when a jury asks the trial court what will happen if it fails to reach a penalty verdict, the court must explain to the jury the consequences of its failure to agree. (*People* v. *Morris* (1991) 53 Cal.3d 152, 227 [279 Cal.Rptr. 720, 807 P.2d 949].) It follows that there is no duty to instruct a jury regarding its possible failure to reach a verdict in the absence of a request by the jury for an explanation.

### M. *Automatic Application for Modification of Penalty*

After the jury returned its verdict imposing the penalty of death, the trial court heard and denied defendant's automatic application for modification of the jury's death penalty verdict under section 190.4, subdivision (e). Defendant contends he must be given a new hearing on that motion, because the trial court, in ruling on the motion, improperly (1) relied on the probation report's recitation of prejudicial and unreliable information not presented to the jury, (2) relied on nonstatutory factors in aggravation, and (3) failed to consider mitigating evidence and the existence of lingering doubt on the question of intent to kill. We shall discuss each of these contentions.

After oral argument on the motion for modification of the jury's verdict of death, the trial judge summarized the proceedings on the record, and continued:

"I have reviewed the probation report, and I have reviewed all the comments that have been made here today. The evidence in this trial that I've heard.

---

capital case on remand from the United States Supreme Court. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103 [2 Cal.Rptr.2d 335, 820 P.2d 559], judgment vacated and cause remanded (1992) 506 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32].)

"If this were a first offense by Mr. Wader, this crime itself for which he is found guilty and for which the jury has recommended the death penalty, I might view this case differently than I'm disposed to do under the circumstances.

"I have reviewed a record which reflects not an accelerating crimes of violence [*sic*] because it appeared from the very earliest stages that Mr. Wader is involved in serious crimes and crimes of violence. [¶] This has been a matter of his life since he was in his preteen years.

"This crime or the crimes that were involved in the case that was before us here, that is before us here involved crimes of violence. [¶] The defendant was armed. And he used weapons at the times of the commissions of the various crimes that were referred to in this offense, and obviously in the case where we had this death verdict. [¶] The crimes involved several victims. The planning and other facts indicated premeditation.

"Mr. Wader is engaged in a pattern of violent conduct. The defendant's prior convictions as an adult are numerous and serious and have been serious for a long time. [¶] He served prior prison terms. He was on parole when he committed this crime. [¶] The defendant's performance on parole was certainly unsatisfactory. There is nothing about his age which one would consider in considering some mitigating circumstance.

"Considering all of these factors, I'm imposing the following sentence. [¶] It is hereby ordered and adjudged for the crime of murder in the first degree with special circumstances, the defendant, Michael Joseph Wader, shall suffer the death penalty in the manner and means prescribed by law."

### 1. *Reliance on Probation Report*

■ Defendant contends that the trial court's comments reflected improper reliance on the probation report. He is right.

The function of the trial court in ruling on a motion for modification of a death verdict under section 190.4 is to independently reweigh the evidence of aggravating and mitigating circumstances that were presented to the jury and then to determine, exercising independent judgment, "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) Because a probation report is not presented to the jury, it was error for the trial court to consider the probation report in ruling on the application for modification of verdict. (*People* v. *Fauber, supra,* 2 Cal.4th at

p. 866; *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].)

Was the error prejudicial? Defendant contends it was. He focuses on the trial court's reliance on his juvenile record. In particular, he invites our attention to these comments by the trial court: "I have reviewed a record which reflects not an accelerating crimes of violence [*sic*] because it appeared from the very earliest stages that Mr. Wader is involved in serious crimes and crimes of violence. [¶] This has been a matter of his life since he was in his preteen years."

As defendant correctly notes, there was no evidence presented to the jury that he was involved in serious crimes or crimes of violence as a juvenile. The jury did hear evidence that defendant had been disciplined for misbehavior at school, had run away from home as a child, and had been picked up by the police and held in juvenile detention facilities and a state facility at Atascadero.

The only indication that defendant committed crimes as a juvenile is found in the probation report, which indicated that at the age of six, he robbed a store while armed with his father's revolver, and that he was "involved in" residential burglaries at the age of ten. According to the probation report, as a juvenile defendant "was arrested numerous times for petty theft, attempted rape, burglary, drunk in public and under the influence of narcotics. . . . [C]harges normally were reduced and he served County time."

Defendant contends this case is controlled by *People* v. *Lewis, supra,* 50 Cal.3d 262. There, too, the trial court read the probation report, which "contained prejudicial information about defendant's juvenile record and prior involvement in a homicide—information that would not otherwise have been known." (*Id.* at p. 287.) We observed that "the record reveals that the court referred to this information in stating its reasons for denial of the application." (*Ibid.*) We concluded that, on the basis of these circumstances, the matter had to be remanded for a new hearing on the defendant's application for modification of the death penalty verdict. (*Ibid.*)

Here, as in *Lewis,* the trial court read a probation report that contained prejudicial information about the defendant's prior history of violent crime. And, as in *Lewis,* the record reveals that the court referred to the information in stating its reasons for denial of the motion.

After our decision in *Lewis,* we have made clear that in determining prejudice, the inquiry must be whether there is "a reasonable possibility that

the error affected the decision." (*People* v. *Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330].) We have also stated elsewhere that "a remand is unwarranted when '[t]he statement of decision makes apparent that the [trial] court did not deem the issue of penalty to be a close one.' [Citation.]" (*People* v. *Daniels* (1991) 52 Cal.3d 815, 893 [277 Cal.Rptr. 122, 802 P.2d 906].)

Here, there is no reasonable possibility that, absent the trial court's consideration of the probation report, the court would have ruled differently on the application for modification. The trial court stated that "[i]f this were a first offense by Mr. Wader . . . I might view this case differently than I'm disposed to do under the circumstances." But this was not a first offense. Defendant also had a record of serious violent crimes as an adult that the trial court properly took into consideration. As noted above, defendant was twice convicted of rape, and once convicted of aggravated assault. Defendant suffered two convictions for nonviolent felonies. And evidence at the penalty phase showed that, in the two months before he murdered Maxine Brown, defendant committed four armed robberies. This evidence of recent conduct, which was properly before the trial court, could not but have weighed heavily in the trial court's determination. Defendant was 40 years of age when he killed Brown, with a long and serious intervening criminal history as an adult; this considerably diminishes the prejudicial danger of the trial court's erroneous consideration of defendant's juvenile record. The trial court's statement of decision, which we quoted earlier, does not indicate that it viewed the question of penalty as a close one. Under the circumstances, it does not appear reasonably possible that, had it not considered the probation report, the trial court would have reached a different decision on defendant's application for modification of the jury's verdict of death.[13]

## 2. *Reliance on Nonstatutory Factors*

Defendant contends the trial court improperly relied on impermissible factors in aggravation in ruling on the application for modification. In particular, defendant claims the trial court erred in relying on the facts that he had served prior prison terms, that he was on parole when he killed the victim in this case, and that his performance on parole was unsatisfactory.

We considered a similar contention in *People* v. *Turner* (1990) 50 Cal.3d 668, 716-717 [268 Cal.Rptr. 706, 789 P.2d 887]. There, we determined that

---

[13]Defendant also asserts that the trial court may have improperly considered references in the probation report to defendant's lack of remorse, to defendant's admissions of various crimes in 1972, and to an argument by the victim's daughter in support of a death sentence. But the trial court did not refer to these aspects of the probation report, and "[i]n the absence of any contrary indication in the record, we will assume the trial judge was able to put aside extraneous information in the report." (*People* v. *Sully, supra*, 53 Cal.3d 1195, 1251.)

the "defendant's recent release from prison is a 'circumstance' of the capital crime" under section 190.3, factor (a) "which is logically relevant to penalty, since it suggests that defendant was unswayed from criminal conduct by his recent incarceration." (*People* v. *Turner, supra,* 50 Cal.3d at p. 717, fn. 31; accord, *People* v. *Johnson, supra,* 3 Cal.4th at p. 1243.) Here, the facts that defendant had served previous prison terms and was on parole shortly before the crimes in this case were before the jury. And, as in *Turner,* the trial court evaluated the "circumstances" of defendant's capital crime "under a normative framework familiar to him from another context, but relevant as well to capital sentencing." (*People* v. *Turner, supra,* 50 Cal.3d at p. 717.) There was no error.

### 3. *Failure to Consider Mitigating Evidence*

■ Defendant maintains that the hearing on his application for modification of the death verdict was defective because the trial court failed to consider relevant mitigating evidence. Specifically, defendant notes that the court made no mention of any of the evidence of mitigation presented by defendant at the penalty phase.

Here, however, the trial judge expressly stated that he had considered "the evidence in this trial that I've heard." The evidence includes evidence introduced by defendant at the penalty phase. That the trial judge did not refer to that evidence more particularly does not mean that the evidence was not considered; rather, the most reasonable inference is that the court simply determined that the mitigation evidence was "insufficient to vitiate the jury's penalty determination." (*People* v. *Sully, supra,* 53 Cal.3d 1195, 1251.)

### N. *Cruel and Unusual Punishment*

■ Defendant argues that the sentence of death in his case is cruel and unusual punishment in violation of the federal and state Constitutions because it is not "proportionate to [his] individual culpability." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 995 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Mincey, supra,* 2 Cal.4th at p. 476.)

The offense here involved the senseless killing of an older and vulnerable victim whom the defendant kidnapped, robbed and terrorized over an entire evening. Defendant was the sole criminal participant in this conduct, and he killed his victim after he had taken her purse and jewelry from her, at a time when she posed no particular threat to his successful completion of the robbery and kidnapping.

The record shows that defendant had a long history of violent criminal activity as an adult, and that the robbery, kidnapping and murder of the

victim here were part of an intensive course of violent criminal conduct over a short period of time. (Compare *People* v. *Dillon* (1983) 34 Cal.3d 441, 482, 486-489.) In light of the foregoing, we conclude that the sentence of death is not unconstitutionally cruel and unusual in this case.

## O. *Constitutionality of the 1978 Death Penalty Law*

■■ Defendant contends the 1978 death penalty law is unconstitutional because it contains so many special circumstances that it fails to perform a narrowing function, and does not provide a " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " (*People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1023, citing *Godfrey* v. *Georgia, supra,* 446 U.S. at p. 427 [64 L.Ed.2d at p. 406].) We have previously rejected the contention that the lying-in-wait special circumstance under the 1978 death penalty law fails to provide a meaningful basis for distinguishing cases in which the death penalty is appropriate from those in which it is not. (*People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244].) Here, defendant asserts that "the most common types of murders occurring in California are those arising from drug deals, robberies and/or burglaries, and domestic disputes." He states that all of these types of murders are likely to qualify as capital crimes under a special circumstance. But defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law. Accordingly, we reject this argument.

Defendant argues that the use of the same facts to prove the felony murder and the special circumstance as well as an aggravating circumstance at the penalty phase violates the constitutional guarantees of due process and against double jeopardy and cruel and unusual punishment. We have elsewhere rejected this same argument. (*People* v. *Webster* (1991) 54 Cal.3d 411, 456 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 945 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant also argues that the 1978 death penalty statute is unconstitutional (a) because it does not require the jury to find beyond a reasonable doubt that death is the appropriate penalty, (b) because it does not require the jury to find that the aggravating circumstances were true beyond a reasonable doubt, (c) because it does not require the jury to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, (d) because the jury is not required to unanimously find which aggravating circumstances are true or that the aggravating factors outweighed the mitigating factors, and (e) because the jury is not required to make written findings on the aggravating

factors found to be true. We have previously rejected each of these arguments, and see no reason to reconsider them. (*People* v. *Duncan, supra,* 53 Cal.3d at pp. 979-980; see *People* v. *Johnson, supra,* 3 Cal.4th at pp. 1255-1256.)

## P. *Sentence for Robbery*

Defendant was sentenced for robbery (count III) and robbery-felony-murder (count I). The robbery in each count was the robbery of Maxine Brown. Defendant's sentence on count III was stayed. ■ Defendant argues that his sentence on count III violates the double jeopardy clause of the federal Constitution.

The United State Supreme Court has held that the double jeopardy clause of the Fifth Amendment protects against, among other things, multiple punishments for the same offense. (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 664, 89 S.Ct. 2072].) The high court has further held that a criminal defendant's "sentence for both felony murder and the underlying felony violate[] the . . . . Double Jeopardy Clause['s] . . . protection against 'multiple punishments for the same offense' imposed in a single proceeding. [Citation.]" (*Jones* v. *Thomas* (1989) 491 U.S. 376, 381 [105 L.Ed.2d 322, 331, 109 S.Ct. 2522]; see *Grady* v. *Corbin* (1990) 495 U.S. 508, 516-517 [109 L.Ed.2d 548, 560-561, 110 S.Ct. 2084].)[14] Because the focus of the double jeopardy inquiry in this context is on multiple punishment, an appropriate remedy is to vacate the defendant's sentence for the underlying felony. (*Jones* v. *Thomas, supra,* 491 U.S. at p. 382 [105 L.Ed.2d at p. 331].) In this case, however, defendant's sentence on the robbery count was stayed. Since defendant will not serve his sentence for robbery, there is no need to vacate the sentence. He is protected against the harm of multiple punishment that the double jeopardy clause prohibits. (*Id.* at p. 382, fn. 2 [105 L.Ed.2d at p. 331].)

## V. CONCLUSION

The judgment is affirmed in its entirety.

Mosk, J., Arabian, J., Baxter, J., and George, J., concurred.

**PANELLI, J.,** Concurring.—I generally concur in the judgment and reasoning of the majority opinion. I write separately, however, because I am not

---

[14]The court in *Jones* v. *Thomas, supra,* 491 U.S. 376, went on to note that in the case before it, the "conviction of both felony murder and attempted robbery gave rise to a double jeopardy claim *only* because the Missouri Legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony." (*Id.* at p. 381 [105 L.Ed.2d at p. 331], first italics added.)

convinced, as is the majority, that the prosecutor committed error under *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]. Further, unlike the majority, I would dismiss two of defendant's claims on the merits as well as on procedural grounds.

## I. *Davenport Error*

The majority correctly reject all but one of defendant's claims of *Davenport* error on the merits. The majority, however, appear to find merit in one of defendant's claims, but hold that the claim was waived by failure to object at trial. In that claim, defendant contends that the prosecutor impermissibly argued that the lack of evidence under factor (d)[1] relating to extreme mental disturbance was a factor in aggravation. I would reject this claim on the merits, as well as on procedural grounds.

The prosecutor's brief argument relating to factor (d) reads: "Well, the only indication that we have of any mental or emotional disturbance would have been the fact that he was scared because she was going to go call the police and that would not seem to qualify under 'extreme mental emotional disturbance.' He was scared, he was angry. He was frustrated. *It would not be the kind of thing that would mitigate the crime* that he committed in any way. It just tells us a little more about the defendant's character." (Italics added.)

In my opinion, the prosecutor's argument properly, if perhaps inartfully, urged that factor (d) was inapplicable as a factor in mitigation given the evidence presented at the penalty phase and that the absence of this factor indicated that the defendant was less deserving of leniency, rather than more deserving of death. Argument of this type does not violate the rule set forth in *Davenport, supra,* 41 Cal.3d at pages 288-290. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788-790 [230 Cal.Rptr. 667, 726 P.2d 113].)

## II. *Prosecutor's Argument Regarding Factor (k) Evidence*

Among the evidence presented by the defendant during the penalty phase was evidence of certain selfless acts to help vulnerable people. Relying upon *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1], defendant contends that the prosecutor improperly argued that this evidence showed that the death penalty was appropriate because defendant had demonstrated that he was capable of living a constructive life but had chosen not to do so. The majority "express no view" regarding whether the

---

[1]References to "factor" throughout this opinion are to the aggravating and mitigating factors specified in Penal Code section 190.3.

prosecutor's comments amounted to misconduct. In my view these comments were permissible.

Unlike the prosecutor in *Edelbacher*, the prosecutor in this case did not tell the jury that facts from appellant's background and history could be an aggravating factor. (Cf. *People* v. *Edelbacher, supra*, 47 Cal.3d at p. 1033.) Rather, the prosecutor's argument was a permissible attempt to rebut defendant's factor (k) evidence by demonstrating that the evidence showed that this factor was inapplicable and did not give rise to an inference that defendant deserved leniency. (*People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 788-790; cf. *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) As we have previously observed, a prosecutor does not overstep the boundaries of proper argument by urging that defendant's factor (k) evidence, including age and missed opportunities, does not excuse the crime, but instead makes the defendant less deserving of leniency. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680], cert. den. (1989) 490 U.S. 1040 [104 L.Ed.2d 414, 109 S.Ct. 1944].) As in *Caro*, the prosecutor's argument in this case properly addressed the meager weight the jury should accord defendant's mitigating evidence.

### III. *Instruction on Aggravating and Mitigating Factors*

I agree with the majority that the invited error doctrine bars defendant's claim on appeal that the trial court erred by instructing the jury with a modified form of CALJIC No. 8.84.1. I would further hold, on this record, that defendant cannot state a claim for ineffective assistance of counsel based upon this error.

To prevail on a claim for ineffective assistance of counsel, defendant must prove both representation falling below an objective standard of reasonableness and a reasonable probability that, but for counsel's failing, a more favorable result would have been obtained. (*In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222], cert. den. (1993) 507 U.S. __ [123 L.Ed.2d 269, 113 S.Ct. 1648]; *Strickland* v. *Washington* (1984) 466 U.S. 668, 687, 694 [80 L.Ed.2d 674, 693, 697, 104 S.Ct. 2052].) If prejudice cannot be shown, there is no reason to determine whether defendant's representation was deficient. (E.g., *People* v. *Fauber* (1992) 2 Cal.4th 792, 831 [9 Cal.Rptr.2d 24, 831 P.2d 249], cert. den. (1993) 507 U.S. __ [123 L.Ed.2d 272, 113 S.Ct. 1651].)

In my view, defendant cannot show the requisite prejudice. While the language added to the standard penalty phase instruction improperly permitted the jury to find any of the factors to be aggravating or mitigating, it is

apparent from the record that the jury was not misled; therefore, no prejudice accrued to defendant.

The prosecutor argued, as aggravation, evidence relating to the circumstances of the crime (factor (a)); defendant's criminal activity involving force or violence (factor (b)); defendant's prior felony conviction (factor (c)); and defendant's age at the time of the crime (factor (i)). In my view, the prosecutor further properly argued the lack of evidence to support the application of the remaining factors.

Defense counsel's argument followed the prosecutor's argument. Defense counsel reviewed at length the mitigating evidence. Defense counsel did not concede that any of the evidence concerning defendant's family background, therapy, prison or other life experience addressed by the prosecutor in her argument were aggravating factors. Rather, defense counsel argued as mitigating factors defendant's background, particularly the circumstances of his childhood, and contested the prosecutor's view that there was little mitigating evidence before the jury. Defense counsel also quoted the factor (k) language and told the jurors that anything before them could be considered a mitigating factor.

In light of the arguments and the instructions taken as a whole (*People* v. *Allison* (1989) 48 Cal.3d 879, 899 [258 Cal.Rptr. 208, 771 P.2d 1294], cert. den. (1990) 494 U.S. 1090 [108 L.Ed.2d 964, 110 S.Ct. 1835]), I cannot conclude that the instructional error misled the jury and resulted in prejudice to the defendant. In my view, defendant's claim of ineffective assistance of counsel must fail for lack of prejudice.

Lucas, C. J., concurred.

Appellant's petition for a rehearing was denied September 1, 1993.