Filed 3/11/15  P. v. Villegas CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B251143 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA402808) |
| v. | |
| JUAN VILLEGAS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. George Gonzalez-Lomeli, Judge.  Affirmed.

Gloria C. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant Juan Villegas.

Melani K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant Fernando Rosales.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Juan Villegas and Fernando Rosales of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] (count 1).[2]  The jury found that a principal personally and intentionally used and discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivisions (b), (c), (d) and (e)(1) and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by a gang member, pursuant to section 186.22, subdivision (b)(1)(C).

The trial court sentenced each defendant to a term of 30 years to life consisting of the low term of five years for the attempted murder and a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).  The court struck the 10-year gang enhancements.

Villegas and Rosales both appeal the true finding on the gang allegation on the grounds that there was insufficient evidence in support of the required elements.  They also argue that, since the gang allegation was not proved, the enhancements under section 12022.53 must be stricken.

**FACTS**

**Prosecution Evidence**

On September 18, 2012, Jerrek Wooden and Kameyah Simms were approached by two Hispanic men, later identified as defendants, who wanted to "hook up" with a woman.  Simms was willing to go with one of them but not both.  She became frightened of them and did not want to get in their van, although they had given her $20.  Wooden and Simms decided to leave, taking the money with them.  They began to walk away, but defendants were persistent and followed them, one on foot and the other driving the red van.  Wooden and the man on foot, Rosales, exchanged words and then got into a fight.  Wooden hit Rosales and "split his face," and Rosales was very angry.  He got back in the

---

[1]    All further statutory references are to the Penal Code.

[2]    Defendants were tried along with a third defendant, Claudia Valencia, who is not a party to this appeal.

van and the van followed Wooden and Simms. At one point, the driver, Villegas, tried to hit Wooden with the van.

In an attempt to get away from defendants, Wooden and Simms went over a wall on the side of the Burger Palace parking lot and entered an abandoned house. After they got over the wall, Simms heard someone yelling "18th Street" and "I'm coming to get you." She also heard them yell "18th Street" when they were following her and Wooden.

Wooden, Simms, and another woman went into the house and sat there for approximately 45 minutes.[3] Upon entering, Wooden saw Mack Lewis lying on a bed in a room. Wooden and his companions went to a different room. Wooden later heard a car in the Burger Palace parking lot slam on its brakes, and then he heard a door slide open. Someone said, "Where that Mayate at?" Wooden explained that "Mayate" is a derogatory term for a Black person. Wooden heard someone jump over the wall. He heard people kicking in the door and yelling their gang name, "18th Street." Wooden acknowledged he was an East Coast Crips gang member.

When the commotion began, Wooden heard Lewis say "It's not me, I'm not the guy." Wooden then heard four or more shots. He and Simms got on the floor and waited until they were escorted out by police. While they waited, they heard the perpetrators walk around inside the house. Wooden believed the perpetrators jumped over the wall because they made noise tramping on the debris that was everywhere in the alley. The only way in or out of the alley was to jump over the wall. Wooden identified Villegas in court as the driver of the van. He identified Rosales as the person with whom he fought. Wooden did not see them with a gun.

Lewis testified that he was sleeping in the abandoned building because he was homeless. He had used crack cocaine and marijuana that day. He was awakened by a crashing noise and saw a person standing over him. The person, later identified as Villegas, said, "What's up now, puto?" When Lewis stood up he saw two more people.

---

[3]    Simms believed it was approximately 10 minutes, and Simms testified there was no one with her and Wooden.

He saw guns being waved at him and said, "Whatever it is, I didn't do it." He ran around the intruders and through the opening in the house toward the wall in the alley. As he ran, he heard gunshots. He was hit in the back and arm. Lewis got over the wall and collapsed on the street in front of arriving police officers. As Lewis lay on the street, he saw two or three people coming over the wall and running to the van. Lewis identified Villegas, Rosales, and Claudia Valencia in court as the three persons who accosted him. He identified Rosales and Claudia Valencia as the ones with guns.

On the night of the shooting, Officers David Tello and Ethan Sillers were at the intersection of Florence and Western Avenues at approximately 3:30 a.m. when they heard gunshots. The gunshots sounded as if they came from the northeast corner of the intersection where a Burger Palace was located. Officer Tello moved toward the Burger Palace and saw Lewis jump over a wall from an adjacent alley. He was screaming and bleeding and had multiple gunshot wounds to the abdomen. Upon reaching the police vehicle, he collapsed. Officer Tello and Officer Sillers next saw Villegas and Claudia Valencia jump over the wall from the alley in the same area.

There was a red van in the parking lot where they landed. Claudia Valencia and Villegas looked in the direction of the officers. Villegas, holding a blue steel revolver, walked behind the van to the passenger side. He then walked behind the van again and reappeared a few seconds later on the driver's side. He got into the van and drove away westbound and then northbound. Claudia Valencia walked to a bus stop on Western Avenue. Officer Tello followed her and called her over. She complied and was detained.

The officers saw Rosales begin to climb over the wall. When he looked in the direction of the officers, Rosales dropped down and began running northbound in the alley. Officer Tello called for an airship. An ambulance took Lewis away.

Officer Sillers and other officers entered the abandoned house alongside the alley where there were signs of a forced entry. Simms and Wooden were removed from the house. Simms was later taken to a field showup, where she identified Villegas and Rosales.

4

A police helicopter spotted the red van traveling northbound and broadcast its location. The van stopped under a tree for a moment and then traveled eastbound. The van pulled over and four police vehicles arrived. Police removed Villegas and Rosales from the van. No gun was recovered.

Officer Gorgonio Medina showed Lewis some photographs within a couple of days after the shooting. Lewis recognized two of the faces and circled the photographs of Villegas and Rosales. Lewis said he was not sure he could recognize the third person, but he knew it was a female. He was able to identify Claudia Valencia in court at the preliminary hearing.

Officer Jose Herrera had contact with Rosales on September 10, 2012. Rosales admitted he was a member of the 18th Street gang and his moniker was "Oso." He said he became a member in El Salvador. He also said he was retired from the gang.

Officer Bryan Espinosa is a police officer assigned to the 77th Division gang enforcement detail unit. He testified as a gang expert.[4] He recounted the history of the 18th Street gang for the jury, stating that it is now an international organization. The East Coast Crips gang is one of their rivals. Officer Espinosa described the common signs used by the 18th Street gang.

Officer Espinosa knew Claudia Valencia and was of the opinion that she was a member of the 18th Street gang at the time of the shooting, and the gang and her clique were active at that time. He and other officers had come in contact with her on numerous occasions in the presence of other 18th Street gang members. Her brother was also in the gang and in the same clique, the 54 Tiny Locos. The officer testified regarding photographs of Claudia Valencia showing her tattoos and making gang signs while smiling. Officer Espinosa testified regarding felony convictions suffered by 18th Street gang members Bobby Nunez and Ismael Valencia. In Officer Espinosa's opinion, the crimes in the instant case were committed for the benefit of the 18th Street gang.

---

[4]     We discuss Officer Espinosa's testimony in greater detail in the discussion portion of this opinion.

**Defense Evidence**

Villegas testified in his own behalf. He did not possess or shoot a gun within an hour or two of being arrested. He did not climb over a wall with a gun in his hand. He was drinking at a bar on Florence Avenue with Rosales on the night of the shooting. Villegas drank 13 or 14 beers. Earlier in the day, he had consumed a 12-pack of beer. They left at 2:00 a.m. when the bar closed, and they were both drunk. Rosales was more intoxicated than he. They ordered more beer through a taxi driver and waited for him in the parking lot of the burger place. He waited with the back of his van open and a Black lady approached Rosales. Rosales and she spoke for a few minutes and she then left. He did not see any money change hands. He did not see Wooden. Because it was cold, he and Rosales got in the front of the van. As he sat there, he heard gunshots. He drove off in his van because he thought he would be shot at.

Villegas and Rosales knew each other from working together on construction. Villegas testified that he was not a gang member. He had never known Rosales to be a gang member. Rosales had never "said gang things" to Villegas and had never asked him to become a member of 18th Street.

Villegas said he did not see Rosales get in a fight with anyone. He did not know how Rosales got a black eye, but he had it the whole day. Before he heard gunshots, but after Rosales had spoken with the Black female, Rosales had asked Villegas to drive to the corner where the liquor store was located. He did so and then drove back to the parking lot. Rosales wanted him to do this because Rosales said he had some sort of argument with some Black person. They waited for the taxi driver with the beer at that point. Later, on cross-examination, Villegas testified that he saw Rosales have a "slight" argument with a Black man. He testified Rosales did not buy drugs from the Black man, although he told police that occurred. Villegas acknowledged that he told police Rosales had friends on 48th Street. He denied that he and Rosales met up with Claudia Valencia after the argument between Rosales and the Black man. Claudia Valencia was never in the van. The first time Villegas saw her was in court.

6

Villegas said he never climbed the wall from the parking lot to the other side. He testified that he does not speak or understand English and therefore could not have said, "What's up, puto?"

Villegas called Officer Gorgonio Medina to the stand, who testified that he requested an analysis of the gunshot residue (GSR) kit used on Villegas. Villegas was the only one of the defendants to have GSR swabs taken from him.

Rosales called Officer Medina, who testified that he requested an examination of metal fragments found in the driveway of the Burger Palace by Officer Sillers and booked into evidence. The metal fragments were not bullets. Officer Medina did not submit any requests for GSR testing for Rosales. Officer Medina stated he had shown six photographs to Lewis, but he made no audio or video recording of Lewis's identifications.

## DISCUSSION

### I.  Alleged Failure to Prove Primary Activities Element

#### A.  *Defendants' Arguments*

Villegas contends there was no credible evidence put before the jury to support its true finding under section 186.22, subdivision (b). Therefore, his right to state and federal due process was violated. The evidence offered by Officer Espinosa fell short of the showing required to prove the primary activities of the gang. Officer Espinosa's naming of crimes, as well as the other evidence (the charged shooting and the predicate crimes), did not provide sufficient proof that the gang consistently and repeatedly committed an enumerated crime. Rosales joins in this argument.

#### B.  *Relevant Authority*

To prove that a gang is a criminal street gang, the People must establish three elements:  (1) that there is an ongoing association involving three or more participants, having a common name, identifying sign, or symbol; (2) *that one of the group's primary activities is the commission of one or more of the crimes listed in the statute*; and (3) the group's members, either separately or as a group, have engaged in a pattern of criminal gang activity.  (§ 186.22, subd. (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 617

7

(*Gardeley*); *In re Alexander L.* (2007) 149 Cal.App.4th 605, 610-611; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.)

When determining whether the evidence was sufficient to sustain a conviction, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "[T]he test of whether evidence is sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 667.) "We draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same standard holds true for an enhancement. (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)

### C. Evidence Sufficient

Defendants complain that Officer Espinoza's knowledge was "too uncertain," and he did not state a logical, reasonable, or coherent opinion of 18th Street's primary activities for the jury's consideration. The officer merely named every crime he could think of. He did not differentiate among the crimes in order to note which were only occasionally committed and were not primary activities, nor did he distinguish between which crimes were gang related and which were committed by gang members on a frolic.

"Proof that a gang's members consistently and repeatedly have committed criminal activity listed in section 186.22, subdivision (e) is sufficient to establish the gang's primary activities. On the other hand, proof of only the occasional commission of crimes by the gang's members is insufficient. [Citation.] Past offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's primary activities, and thus both may be considered by the jury on the issue of the group's primary activities. [Citation.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1464-1465; see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323; *People v. Galvan* (1998) 68 Cal.App.4th 1135, 1140.)

8

Here, the jury was instructed that it could consider (1) any expert opinion evidence; and (2) evidence of the past or present conduct by gang members that involved the commission of one or more of the identified crimes, including the crimes charged in the instant proceeding. (CALJIC No. 17.24.2.) The identified crimes were murder, attempted murder, robbery, firearm possession, and shooting into an occupied vehicle. (*Ibid*.)

With respect to expert testimony, it is established that "[t]he testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1465; see also *People v. Vy*, *supra*, 122 Cal.App.4th at p. 1226; *People v. Augborne*, *supra*, 104 Cal.App.4th 362, 372.) Officer Espinosa testified he was familiar with the primary activities of the 18th Street gang from speaking to gang members and former gang members and from working in conjunction with Homeland Security. He was part of a task force dealing with the 18th Street gang where law enforcement questioned gang members, inter alia, about their activities, the kinds of crimes they committed to assist the gang to gain a reputation, how it benefited them as a gang member, and how it assisted them in climbing the ranks. He had personally arrested 18th Street gang members for crimes listed in section 186.22 and had reviewed arrest reports from other officers following arrests or investigations of 18th Street gang members. He had also reviewed other felony conviction documents and spoken with other officers about their investigations of 18th Street gang members.

Based on all of these sources, Officer Espinosa testified that, in September 2012, the primary activities of the 18th Street gang included murder, murder for hire, attempted murder, carjacking, robberies, burglaries, kidnappings, vandalism, narcotics, identity theft, fraud, and firearm possession. When asked by the prosecutor, Officer Espinosa confirmed that the following crimes were also among the gang's primary activities: possession of firearms by convicted felons, possession of loaded and unregistered

9

firearms in public, shooting from a motor vehicle, and shooting at an occupied vehicle or residence.

Also, Officer Espinosa testified that Bobby Nunez was an 18th Street gang member from the same clique as Claudia Valencia, and Officer Espinosa himself had arrested Nunez in the past. In case No. BA396734, Nunez was convicted of robbery with a street gang enhancement on April 7, 2012. Officer Espinosa testified regarding a conviction for felony vandalism suffered by Ismael Valencia of the 18th Street gang on February 23, 2012, in case No. BA394388. The defendant admitted the gang allegation in that case. Officer Espinosa had had numerous encounters with Ismael Valencia. Officer Espinosa agreed that the robbery and vandalism offenses by these two individuals were committed for the benefit of, at the direction of, or in association with a street gang. Merely because the convictions suffered by Nunez and Ismael Valencia were used to establish a pattern of criminal activity does not preclude their consideration as evidence supporting a conclusion that committing certain crimes enumerated in the statute constituted the gang's primary activities.

Just as in *Gardeley*, *supra*, 14 Cal.4th at page 620, the jury could rely on Officer Espinosa's expert opinion because it was based on his own arrests, conversations with other officers, gang members, and the public, as well as his review of the police resources. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) We believe Officer Espinosa's experience and knowledge, which was acquired from sources approved in *Gardeley*, were sufficient to support the "primary activity" element of the gang allegation and the jury's true finding. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330; *Sengpadychith*, at p. 324; *Gardeley*, at p. 620.) Although defendants complain that Officer Espinosa did not distinguish between which crimes were committed by gang members on a frolic, there was no need for him to do so. He was not asked to provide, and was not required to provide, dates and case numbers. Officer Espinosa was asked to name crimes committed as part of the *gang's* activities and would therefore not have included nongang-related offenses.

10

In addition, Officer Espinosa's testimony helped to establish circumstantially that the gang's primary activities included the enumerated crimes. The officer explained that respect, which is of paramount importance to a gang as a whole and to its members, is gained by committing acts of violence and showing that the members are willing to use violence. Officer Espinosa explained that a gang member cannot move up the ranks unless he or she is able to commit serious crimes. Thus, Officer Espinosa's testimony established that the 18th Street gang committed criminal activity "*consistently and repeatedly*" rather than on an occasional basis. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) Moreover, the evidence showed that the defendants in this case got together with Claudia Valencia, a known 18th Street gang member, to commit an attempted murder, one of the gang-related crimes listed in section 186.22, subdivision (e).

*People v. Vy*, *supra*, 122 Cal.App.4th 1209, is instructive. In that case, the court held that the commission of three violent felonies, including the charged offense, within a three-month period of time was sufficient to satisfy the requirement of primary activity. (*Id*. at pp. 1224-1225.) In this case, Officer Espinosa testified about two felony convictions suffered by 18th Street gang members on February 23, 2012, and on April 7, 2012, less than two months apart. The current offense of attempted murder was committed on September 18, 2012. In a period of approximately seven months, three serious crimes were committed by 18th Street gang members, at least three of whom were from the same 54 Tiny Locos clique, which numbered only about 60 members.

Presuming the existence of every fact the jury could reasonably deduce from the evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1053), the jury's guilty verdicts on the charged offenses, as well as the expert testimony, constituted sufficient evidence of the gang's primary activities. Because we find the evidence sufficient, we reject defendants' claims that they suffered state and federal due process violations.

## II. Alleged Failure to Show Required Intent Under Section 186.22, Subdivision (b).

### A. *Defendants' Arguments*

Rosales contends that the prosecution failed to prove the first element of the gang allegation in that there was insufficient evidence the shooting was gang related. He

specifically argues they were not acting for the benefit of the 18th Street gang.  In addition, he argues that the second element was not proved because there was insufficient evidence they acted with the specific intent required.

Villegas, in joining in Rosales's argument, asserts that Rosales's demonstration that the evidence was insufficient to show he was a member of the 18th Street gang who acted to benefit the gang and had the specific intent to promote the gang's criminal conduct relieves Villegas of liability for the gang enhancement as well.  Villegas asserts that the two men acted to avenge their personal grievances.

### B.  Relevant Authority

As stated previously, "the test of whether evidence is sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citations.]"  (*People v. Holt*, *supra*, 15 Cal.4th at p. 667.)  "We draw all reasonable inferences in support of the judgment."  (*People v. Wader* (1993) 5 Cal.4th 610, 640.)  Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)  If the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reconciled with a contrary finding does not warrant a reversal.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

Generally speaking, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs—including the motivation for an individual member's actions—is permissible, and a jury may rely on such testimony to render a finding on the allegation.  (*People v. Ward* (2005) 36 Cal.4th 186, 210; *Gardeley*, *supra*, 14 Cal.4th at p. 617.)

### C.  Evidence Sufficient

Section 186.22, subdivision (b)(1) provides for a sentence enhancement when the defendant is convicted of enumerated felonies "committed for the benefit of, at the direction of, *or* in association with any criminal street gang, with the specific intent to

12

promote, further, or assist in any criminal conduct by gang members . . . ." (Italics added.) With respect to the benefit/direction/association element, the statute clearly requires only one of the three conditions.

In the instant case, the evidence showed that defendants committed the shooting in association with a criminal street gang, at a minimum. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1191-1198 [although commission of a crime by two or more gang members may not show crime was committed for the benefit of the gang, these facts do show crime committed in association with gang].) Claudia Valencia was a proud member of the 18th Street gang, and Rosales was also a member, even though he told an officer he had retired. Moreover, since subdivision (b) of section 186.22 does not require a showing of current, active gang membership (*In re Ramon T.* (1997) 57 Cal.App.4th 201, 206-207), Rosales's claim that his gang membership was a thing of the past had little countervailing effect on the prosecution evidence. One or more of the three perpetrators in this case yelled "18th Street" when following Wooden and Simms and later when announcing their arrival in the alley, demonstrating a gang motivation. And, although Villegas claims he never knew of Rosales's gang affiliation, whether former or current, assuming Villegas's version of events was untrue (as the jury found), he would have had no doubts about Claudia Valencia's affiliation. Villegas was clearly in association with Claudia Valencia when he joined her and Rosales in going after Wooden and Simms.

The evidence in this case also supports the conclusion that the shooting was committed for the benefit of the 18th Street gang. When given a hypothetical scenario based on the facts of the instant case, Officer Espinosa, relying on his background, training, education, and experience, was of the opinion that the hypothetical shooting was committed at the direction of, for the benefit, and in association with the 18th Street gang and with the intent to promote or further or assist in criminal conduct by gang members. As Officer Espinosa testified, by yelling "18th Street," the gang members let any witnesses or victims know that they belonged to this particular gang and that if anyone created any problems for them, they would retaliate. Officer Espinosa explained that

13

respect means everything to a Hispanic gang member, especially from 18th Street. If a gang member was not given respect, he or she took it. If disrespected in any way, the gang member must retaliate against the individual or anyone involved because disrespect to a gang member is perceived as disrespect to the gang itself. Clearly, a shooting committed to enforce respect for a gang is for the benefit of that gang.

As Officer Espinosa further explained, if a gang member lost a fight, he appeared weak. Rosales not only took a beating from Wooden, he was "punked" out of $20, making him look even weaker. As a result, the gang appeared weak as well. Officer Espinosa testified that this would make the loser's gang a target for rival gangs. A lack of retaliation tells rival gangs that this is a weak gang and they can move into their turf and take over. Defendants make much of the fact that, in their view, Officer Espinosa gave unsatisfactory answers to questions on cross-examination about how a nongang member would react to having $20 taken from him. The jury heard defense counsel's questions and Officer Espinosa's answers and was capable of determining the likelihood that an ordinary citizen, even an irrational one with a bad temper and high level of alcohol in his system (as defendants posit), would look for a gang member to accompany him in order to employ deadly force after being hoodwinked out of $20.

Finally, the fact that defendants went away and brought back Claudia Valencia, an established gang member, was evidence that the crime was committed at the direction of a gang. Officer Espinosa testified that the role of a gang member who is brought to a shooting or a crime scene is to verify that the crime was actually carried out and by whom. The one who verifies has rank and is also there to give direction.

With respect to the element requiring that the perpetrators act "with the specific intent to promote, further, or assist in any criminal conduct by gang members," we note that intent is "rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495, citing *People v. Beeman* (1984) 35 Cal.3d 547, 558-559; see also *People v. Lewis* (2001) 26 Cal.4th 334, 379.) The jury was

instructed that the specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. (CALJIC No. 2.02.)

"'[T]he scienter requirement in section 186.22(b)(1) . . . applies to *any* criminal conduct, without a further requirement that the conduct be "apart from" the criminal conduct underlying the offense of conviction sought to be enhanced.' [Citation.] '[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171; see also *People v. Hill* (2006) 142 Cal.App.4th 770, 774; *People v. Romero* (2006) 140 Cal.App.4th 15, 20.)

In this case, evidence of the required intent can be found in the fact that defendants, one of whom has ties to a gang, whether current or not, intended to seek the aid of another gang member, and intended to commit the shooting. One of more of the defendants shouted out the name of their gang during the commission of the crime. There is clearly some evidence the crime itself had "'some connection with the activities of a gang'" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199), which allowed the jury to draw a legitimate inference of intent to promote criminal conduct by gang members.

Finally, although facts could be marshaled in support of a theory that Rosales and Villegas were engaged in a personal quest for revenge, the fact that they enlisted Claudia Valencia in their plans suggests otherwise. Moreover, although the circumstances might be reconciled with a contrary finding (see *People v. Kraft*, *supra*, 23 Cal.4th at pp. 1053-1054), "[r]esolution of conflicting evidence and credibility issues was for the jury to decide. [Citation.] . . . Because substantial evidence supports [the jury's] determination, "'that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" [Citation.]' [Citation.]" (*People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1331.) Defendants' arguments are without merit, and sufficient evidence supports the jury's true finding on the gang enhancement.

15

Consequently, they have suffered no violation of their due process rights under the state and federal Constitutions.

### III.  Firearm Enhancement Under Section 12022.53, Subdivisions (d) and (e)(1)

#### A.  Defendants' Arguments

Defendants contend that, since they have demonstrated that the evidence was insufficient to meet the requirements of section 186.22, subdivision (b) for failure to establish several elements of the statute beyond a reasonable doubt, the section 12022.53, subdivision (d) enhancement must be stricken.

Section 12022.53, subdivision (e)(1) imposes liability on a defendant, even if he or she is not the shooter, when a principal, in commission of the offense, used a firearm while violating subdivision (b) of section 186.22.  The jury was instructed that it could find the firearm allegation true if a principal discharged a firearm causing great bodily injury.  (CALJIC No. 17.19.5.)  Since we have concluded that sufficient evidence supports all elements of the jury's true finding on the gang allegation, we reject defendants' contention that their sentence enhancements pursuant to section 12022.53, subdivision (d) and (e)(1) must be reversed.

### DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

16